239 P.3d 1120 (2010)
In the Matter of the DEPENDENCY OF B.R., b.d. 09/05/03, and T.V., b.d. 12/17/05, Minor Children.
Letitia Monique Vandermeer, Appellant,
v.
State of Washington Department of Social and Health Services, Respondent.
Nos. 63788-6-I, 63789-4-I.
Court of Appeals of Washington, Division 1.
September 27, 2010.
*1121 Mindy M. Ater, Wash. App. Project, Seattle, WA, for Appellant.
Arlene K. Anderson, Michael S. Majors, Office of the Atty. General, Everett, WA, for Respondent.
Martin W. Hodges, Attorney at Law, Everett, WA, for Guardian Ad Litem.
Rima J. Alaily, Microsoft Corp., Redmond, WA, Molly A. Terwilliger, Summit Law Group, Seattle, WA, for Amicus Curiae (Legal Voice).
SCHINDLER, J.
¶ 1 Letitia M. Vandermeer appeals the trial court's decision to terminate parental rights to her two children. The trial court identified the central parental deficiency as the mother's relationships with abusive partners. Because clear, cogent, and convincing evidence does not support the findings that Vandermeer is currently unfit to parent or that there is little likelihood conditions would be remedied so the children could be returned to Vandermeer in the near future, we reverse and remand.

FACTS[1]
¶ 2 Letitia Vandermeer is the mother of B.R., born on September 5, 2003, and T.V., *1122 born on December 17, 2005. Andrew Renfro is the father of both children.
¶ 3 Vandermeer and Renfro were together off and on from 1999 until 2003. During the relationship, Renfro abused Vandermeer. Vandermeer and Renfro separated a month after B.R. was born. Vandermeer testified that the last time Renfro was violent towards her was before B.R. was born.
¶ 4 In February 2005, Vandermeer and Destry Schnebly started living together. Vandermeer worked full time. Schnebly or his mother routinely provided child care for B.R.
¶ 5 On May 31, 2005, Harborview Hospital contacted the Department of Social and Health Services (DSHS) to report that B.R. had sustained a brain injury. Schnebly said that B.R. fell down the stairs. The doctors stated that the head injury B.R. sustained was consistent with the type of injury caused by being shaken, not falling down the stairs. DSHS took B.R. into protective custody.
¶ 6 DSHS filed a dependency petition on June 3. On July 5, DSHS and Vandermeer entered into an agreed order for an in-home dependency. The order finds B.R. is dependent under RCW 13.34.030(5)(c), stating there is "no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development." The disposition order requires Vandermeer to complete a DSHS approved anger management assessment, continue to participate in an approved domestic violence support group, and adhere to the protection order against Schnebly and the protection order against Renfro.
¶ 7 In September 2005, Vandermeer obtained an anger management assessment and a domestic violence evaluation at Phoenix Counseling and Court Services. The report states that neither "anger management [nor] domestic violence treatment is indicated in this case," but recommends that Vandermeer begin attending a support group for victims of domestic violence and maintain the protection order against Schnebly "indefinitely."
¶ 8 At the dependency review hearing on October 4, 2005, the court found that Vandermeer had complied with court-ordered services, including completing the anger management assessment, participating in a domestic violence support group, and maintaining the protection order against Renfro. However, because Vandermeer did not file the return of service for the protection order against Schnebly, the court ordered B.R. removed from her care and ordered Vandermeer to obtain a valid protection order against Schnebly.
¶ 9 In a services evaluation in November 2005, DSHS expressed concern that Vandermeer "seems unable to move forward but instead seems to be waiting for the final determination of [Schnebly's] guilt or innocence. If he is guilty, she has stated that she will cut off all contact with him." The report also states that Vandermeer:
has participated in services that have been recommended and is likely to follow through with any needed ongoing services. From the beginning of the intervention until the end, she has stated her commitment to [B.R.] and to doing whatever is necessary to see him in her care.
¶ 10 On December 17, 2005, T.V. was born.[2] DSHS filed a dependency petition as to T.V. on December 20.[3] DSHS alleged the dependency was justified by the abuse inflicted by Schnebly on B.R., and by Vandermeer's failure until recently to obtain a valid protection order against Schnebly. Following a shelter care hearing, the court allowed T.V. to remain in Vandermeer's care. The court ordered Vandermeer to not allow any contact between T.V. and Schnebly or Renfro. Renfro later established paternity of T.V.
¶ 11 In response to the dependency petition, Vandermeer admitted that Schnebly injured B.R. in May 2005, and that B.R. was removed a second time in October 2005 because *1123 of her failure to obtain a valid protection order against him.
¶ 12 On March 14, 2006, DSHS and Vandermeer entered into an agreed dependency order that allowed T.V. to remain in Vandermeer's care in an in-home dependency. The disposition order required Vandermeer to maintain the protection order against Schnebly and attend domestic violence support groups. A week later DSHS also placed B.R. back in Vandermeer's care under an agreed court order restoring the in-home dependency.
¶ 13 Over the next year, the court conducted periodic dependency review hearings. The court consistently found Vandermeer in compliance with the disposition order. DSHS planned to request dismissal of the dependencies. However, in May 2007, DSHS learned that Vandermeer had contact with Schnebly in August 2006, when she attended the funeral of his mother. Vandermeer acknowledged seeing Schnebly at the funeral, but said the contact was innocuous.
¶ 14 At a dependency review hearing on May 24, 2007, the court found that Vandermeer "violated the no contact order with Destry Schnebly in August '06.... Continuing contact is a serious concern." The court ordered B.R. and T.V. placed in protective custody. The court ordered Vandermeer to obtain a psychological evaluation and required supervised visitation.
¶ 15 Evan B. Freedman, Ph.D., conducted the evaluation of Vandermeer, but DSHS did not authorize "a full assessment of parental competence." DSHS asked Dr. Freedman to assess Vandermeer's "intellectual and emotional function and make any relevant treatment diagnoses." DSHS specifically raised questions concerning Vandermeer's ability to keep her children safe and her amenability to services. DSHS expressed significant concerns regarding "lack of supervision, minimization of the effect that abuse and neglect has had on the children and the potential that Ms. [Vandermeer] has continued to maintain a relationship with an unsafe/abusive partner."
¶ 16 In his report dated January 4, 2008, Dr. Freedman noted that despite Vandermeer's chaotic upbringing, her exposure to drug and alcohol abuse, and placement in foster care as a teenager, Vandermeer was academically successful and has a strong work history with no indications of drug or alcohol abuse:
In spite of her earlier childhood history, Ms. [Vandermeer] does demonstrate several strengths, specifically what appears to be Average Intellectual Function, relative success academically, a lack of significant drug and alcohol issues and an apparent strong work history.
¶ 17 Dr. Freedman identified the most significant concern as the potential for neglect by allowing contact with potentially dangerous partners:
[T]he more significant concern is around the potential for neglect, specifically by allowing contact with potentially dangerous adults. This concern is heightened by the fact that Ms. [Vandermeer] continues to struggle to learn this lesson in spite of the fact that one of her former paramours inflicted serious injury upon one of her children resulting in an extended hospitalization. As noted below in the treatment recommendations, Ms. [Vandermeer] will need consistent and ongoing support in order to learn improved self-understanding and interpersonal skills, specifically around setting limits and boundaries with negative partners. It is also hoped that she will gain further insight into the negative effects both on herself and her children of her potential affiliation with negative male partners.
¶ 18 Dr. Freedman's treatment recommendations included counseling and participation in a support group for victims of domestic violence.
The following treatment recommendations are provided in hopes of supporting Ms. [Vandermeer] and her parental ability:
1. Given Ms. [Vandermeer]'s history and personality configuration, she will have difficulty setting limits with romantic partners and a tendency to affiliate with potentially negative or abusive partners. It is hoped that through therapy and support Ms. [Vandermeer] will be better able to manage these *1124 kinds of relationships. Nonetheless, those working with her should be on guard and intervene if she affiliates with male intimates who might potentially harm her children.
2. It is recommended that Ms. [Vandermeer] participate in victim/survivor's domestic violence treatment.
Dr. Freedman noted some concern about whether Vandermeer was amenable to psychotherapy, but concluded she would benefit from counseling:
Ms. [Vandermeer] may not be a particularly good candidate for psychotherapy as she is both defensive, lacks insight, and it is unlikely to acknowledge shortcomings are challenges.... Nevertheless, Ms. [Vandermeer] would benefit from ongoing counseling to help her further develop a sense of her own self, facilitate emotional maturity, build interpersonal and self-soothing skills, as well as improving social judgment. Treatment should focus on both development of improved object relations as well as concrete coping and self-soothing skills.
¶ 19 Based on Dr. Freedman's evaluation, Vandermeer began individual counseling sessions with Lynne Springer in February 2008. The counseling focused on two goals: (1) helping her "gain insight with regard to her self-esteem" and learn how to set "appropriate boundaries;" and (2) learn the difference between "healthy and unhealthy relationships, and how these two specifically relate to the well-being of both herself and her children."
¶ 20 In April 2008, Springer reported Vandermeer was actively engaged in counseling sessions with her at New Beginnings. Springer states that Vandermeer had gained insight, recognized her strengths, and completed the goal of learning about unhealthy relationships. Springer noted Vandermeer's many strengths, including a strong work history and desire to get B.R. and T.V. back. Springer expressed some concern about Renfro continuing to make unwanted contacts with Vandermeer. But Springer stated that Vandermeer "is ready to move toward unsupervised overnight visits."
¶ 21 In August 2008, DSHS placed B.R. and T.V. with a foster family in the Tri-Cities area.[4] At first, Vandermeer had difficulty spending time with the children because of the expense of travelling from her home in Everett. However, after DSHS agreed to pay expenses, she was able to resume regular visits with B.R. and T.V.
¶ 22 In September 2008, Springer issued a final counseling report stating that Vandermeer had completed the counseling goals during a total of 12 sessions. In the final report, Springer describes Vandermeer's strengths, her love and concern for B.R. and T.V., and her "strong desire to bring them home to her care once again as soon as possible."
[Vandermeer] has many strengths such as being one of the only children in her large family to graduate from high school and remaining substance abuse free; she has consistently worked; she is perseverant, well mannered, considerate, articulate and smart; and she appears to be a caring parent who wants to teach and nurture her boys.
Throughout the duration of this counseling intervention, [Vandermeer] has professed her great love and concern for her two [children, B.R. and T.V.], and has maintained her strong desire to bring them home to her care once again as soon as possible. It is my belief that she would not be a danger to her two young [children] in terms of neglect or abuse.
¶ 23 Springer also states that there "continues to be a concern about the choices in relationships [Vandermeer] appears to continue to make despite this intervention, and therefore her current ability to keep her children safe and to nurture their optimal development." But Springer did not recommend further individual counseling. Instead, Springer recommended that Vandermeer continue to attend a support group for victims of domestic violence to "ensure the safety and well-being of her two young children as well as for her own continued positive growth and development."

*1125 [Vandermeer] is a smart young woman, and I have faith that she can achieve what she needs to achieve in order to get her two young [children] returned to her care if she puts her mind to it, by: 1) more confidently using the strengths and skills she already has within her; 2) actively embrace and utilize the skills she has learned in this counseling intervention; 3) complete the above recommendations; and 4) given her lack of healthy family and/or peer supports, [Vandermeer] will need to develop other positive relationships, such as through a support group for example a single parents group, a young women in transition group, or a church group, to support and encourage her as she moves forward in order to increase her likelihood of success.
¶ 24 On January 7, 2009, DSHS filed a petition to terminate parental rights to B.R. and T.V.[5] The petition describes the injury to B.R. in 2005 and the procedural history of the dependencies. DSHS alleged Vandermeer and Renfro were expressly offered or provided all necessary services capable of correcting parental deficiencies and "[t]he parents have failed to substantially improve parental deficiencies within twelve months following entry of the dispositional order."
¶ 25 At the request of DSHS, Dr. Freedman reviewed a number of documents to determine whether to update his evaluation of Vandermeer before trial. The documents Dr. Freedman reviewed included letters of compliance from the battered women treatment program, the final report from Springer, and a recent declaration of the DSHS caseworker. Based on his review of the information provided by DSHS, Dr. Freedman concluded there was "no need to re-interview or complete an addendum to the evaluation" because "[a]ny clinical conclusions or treatment recommendations would remain the same."
¶ 26 The two-day termination trial began on June 8. At the beginning of trial, Renfro voluntarily relinquished his parental rights to B.R. and T.V. DSHS called a number of witnesses, including Dr. Freedman, Springer, and the DSHS caseworkers. Vandermeer testified. Several visitation supervisors and a public defense social worker also testified on her behalf.
¶ 27 There was no dispute at trial that Vandermeer engaged in all court-ordered services. She completed the psychological evaluation with Dr. Freedman, followed all treatment recommendations by engaging in individual counseling with Springer, and attended approximately 40 to 50 domestic violence support group sessions. Throughout the dependency, Vandermeer also worked full time and paid child support to DSHS.
¶ 28 Furthermore, there was no dispute that when Vandermeer had custody of the children from March 2006 to May 2007, she exhibited excellent parenting skills and was able to protect her children from harm. And when the children were in foster care, Vandermeer regularly spent time with them and continued to exhibit excellent parenting skills. For example, the DSHS caseworker testified that:
She absolutely loves and adores her children. That's without question. I can see that. She's interested in them and what they're doing and how they're doing, and kind of on their level, like, What did you do today? Those sorts of things. And she gets involved with them. So she will bring activities and things to the visits. So she takes care of kind of their basic needs.
¶ 29 The DSHS caseworker also testified that Vandermeer had not had any contact with Schnebly since August 2006, and that she was unaware of any acts of domestic violence towards Vandermeer during the dependency. DSHS introduced evidence of Renfro's prior convictions for domestic violence. The testimony established that the most recent domestic violence conviction was against Renfro's current wife in March 2009.
¶ 30 Vandermeer testified that at first she did not believe Schnebly harmed B.R., and that he was never violent towards her. Vandermeer said that after learning that Schnebly injured B.R., she only saw Schnebly the one time when she attended his mother's funeral in August 2006.
*1126 ¶ 31 Vandermeer testified that Renfro never physically harmed B.R. or T.V. and he had not abused her since shortly before B.R. was born in 2003. Vandermeer admitted having contact with Renfro in 2008, and that she had sex with him in November 2008, resulting in her third pregnancy. But Vandermeer said that Renfro's recent conviction for assaulting his wife convinced her that he would not change. Vandermeer testified that she had taken steps to avoid any contact with Renfro, including obtaining a new phone number and living at an undisclosed location.
¶ 32 The court ordered termination of Vandermeer's parental rights to B.R. and T.V. The trial court identified the central issue as "the mother's decisions relating to relationships with abusive partners." The court found that "[d]espite the extensive services the mother completed, the mother has not changed her decision making with respect to men," and no other services were available that were capable of correcting her parental deficiencies in the near future. Vandermeer appeals.[6]

ANALYSIS
¶ 33 Vandermeer contends clear, cogent, and convincing evidence does not support the trial court's finding that she is currently unfit to parent, that there are no other services available capable of correcting her parental deficiencies within the foreseeable future, or that there is little likelihood conditions would be remedied so that the children could be returned to her in the near future.
¶ 34 It is well established that parents have a fundamental liberty and property interest in the care and custody of their children. U.S. Const. amends. V, XIV; Wash. Const. art. I, § 3; Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); In re Custody of Smith, 137 Wash.2d 1, 27, 969 P.2d 21 (1998). The State may interfere with a parent's constitutional due process right "only if the state can show that it has a compelling interest and such interference is narrowly drawn to meet only the compelling state interest involved." Smith, 137 Wash.2d at 15, 969 P.2d 21. In a termination proceeding, the State has a compelling interest to prevent harm to children and has an obligation to intervene and protect a child from harm or risk of harm. Santosky, 455 U.S. at 766, 102 S.Ct. 1388. "[W]hen parental actions or decisions seriously conflict with the physical or mental health of the child, the State has a parens patriae right and responsibility to intervene to protect the child." In re Sumey, 94 Wash.2d 757, 762, 621 P.2d 108 (1980).
¶ 35 To terminate a parent-child relationship, DSHS must establish the six statutory elements set forth in RCW 13.34.180(1) by clear, cogent, and convincing evidence. RCW 13.34.180(1) provides:
(a) That the child has been found to be a dependent child;
(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
(c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future ....; and
(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.
Evidence is clear, cogent, and convincing "when the ultimate fact in issue is shown by the evidence to be `highly probable.'" In re Dependency of K.R., 128 Wash.2d 129, 141, 904 P.2d 1132 (1995) (quoting In re Welfare of Sego, 82 Wash.2d at 736, 739, 513 P.2d 831 (1973)). If DSHS proves the six statutory elements, the court must also consider *1127 whether termination is in the best interest of the child. RCW 13.34.190(1)(a), (2). Whether termination is in the best interest of the child must be shown by a preponderance of the evidence. In re Dependency of A.M., 106 Wash.App. 123, 131, 22 P.3d 828 (2001).
¶ 36 We review the record to determine whether substantial evidence supports the findings, which in turn establish the statutory factors and support the decision to terminate. In re Dependency of K.S.C., 137 Wash.2d 918, 925, 976 P.2d 113 (1999). Unchallenged findings are verities on appeal. In re Interest of J.F., 109 Wash.App. 718, 722, 37 P.3d 1227 (2001).
¶ 37 Vandermeer asserts clear, cogent, and convincing evidence does not support the trial court's determination that she is currently unfit to parent. Vandermeer contends that because DSHS did not prove current parental unfitness, the decision to terminate her parental rights to B.R. and T.V., must be reversed.
¶ 38 In a recent decision, In re Welfare of A.B., 168 Wash.2d 908, 232 P.3d 1104 (2010), our Supreme Court held that the trial court must make an explicit finding that the parent is currently unfit. If there is no explicit finding of current parental unfitness, the court held that:
the appellate court can imply or infer the omitted finding ifbut only ifall the facts and circumstances clearly demonstrate that the omitted finding was actually intended, and thus made, by the trial court.
A.B., 168 Wash.2d at 921, 232 P.3d 1104.
¶ 39 Here, the trial court appears to have explicitly identified Vandermeer's parental deficiency as an inability to set limits with abusive partners: "Letitia Vandermeer is not currently available for the children and will not be a parenting resource in the foreseeable future." In reaching the conclusion that Vandermeer was currently unfit, the trial court expressly relied on Dr. Freedman's testimony at trial that "little had changed" with respect to her ability to set limits with male partners.
¶ 40 Dr. Freedman testified that, based on his psychological evaluation of Vandermeer in January 2008, her relationships with men were a potential risk to her children and that despite her participation in "all of the treatment he recommended, little had changed with respect to [her] abilities to set limits with male partners."
¶ 41 The trial court's findings state, in pertinent part:
1.22. The mother completed a psychological evaluation on November 29, 2007, with Evan B. Freedman, Ph.D. Dr. Freedman opined in his January 2008 report that `given Ms. [Vandermeer]'s history and personality configuration, she will have difficulty setting limits with romantic partners and a tendency to affiliate with potentially negative or abusive partners. It is hoped that through therapy and support Ms. [Vandermeer] will be better able to manage these kinds of relationships.' Dr. Freedman recommended the mother participate in counseling, and victim/survivor's domestic violence treatment. At trial, Dr. Freedman noted that while Ms. Vandermeer had participated in all of the treatment he recommended, little had changed with respect to Ms. Vandermeer's abilities to set limits with male partners.
1.23. There are no other services available, not previously offered or provided, which are capable of correcting ... Vandermeer's parental deficiencies within the foreseeable future.
...
1.26. There is no dispute about the mother's parenting skills. The testimony of all witnesses who observed her interactions with the [children] was positive. The mother does not have any problems parenting the children directly. The central issue was the mother's decisions relating to relationships with abusive partners.
1.27. Despite the extensive services the mother completed, the mother has not changed her decision making with respect to men. While the mother claims that she has learned how to set boundaries with men, her actions demonstrate otherwise.
The trial court also points to Springer's testimony that Vandermeer was unwilling to "cut *1128 off all contact" with Renfro. The trial court's findings state, in pertinent part:
1.28. Lynn Springer, the mother's counselor noted in her final counseling report in September 2008 that there `continues to be a concern about the choices in relationships [Vandermeer] appears to continue to make despite this intervention, and therefore her current ability to keep her children safe and to nurture their optimal development.' As an example, Ms. Springer cited the mother's inability or unwillingness to cut off all contact with the children's father, Andrew Renfro, or to set appropriate boundaries with him. Ms. Springer testified at trial that Mr. Renfro would call the mother's cell phone during their counseling sessions.
1.29. Ms. Springer counseled the mother extensively about her relationship with Mr. Renfro advising her to discontinue the relationship and set boundaries. Nevertheless, the mother continued to have a relationship with Mr. Renfro.
¶ 42 Accordingly, the trial court identifies the "central issue" as "the mother's decisions relating to relationships with abusive partners" in finding that Vandermeer "is not currently available for the children and will not be a parenting resource in the foreseeable future." Vandermeer contends clear, cogent, and convincing evidence does not support the current findings of parental unfitness. We agree.
¶ 43 The undisputed testimony at trial established that Vandermeer had not had any contact with Schnebly after attending his mother's funeral in August 2006. The testimony also shows that Schnebly did not abuse Vandermeer and that when they were living together, she had no reason to suspect he posed a threat to B.R. As to Renfro, the evidence shows that the last incident of domestic violence against Vandermeer took place shortly after B.R. was born in 2003, and contrary to the assertion by DSHS, there is no evidence in the record of domestic violence by Renfro against B.R. or T.V.
¶ 44 Vandermeer testified that the children were the victims of domestic violence based only on B.R.'s presence when Renfro verbally abused her when B.R. was a baby.
Q Do you consider yourself to be a victim of domestic violence?
A Yes.
...
Q How come?
A Because even though it wasn't like not physical stuff, there was still emotional, and I was yelled at and stuff thrown at me.
Q Do you consider the children to be victims of domestic violence?
A Yes.
Q Why?
A Because with [B.R., B.R.] was around when it happened.
Q Anything else? Just that he was around it?
A I don't know how to explain, but I know it does affect him, because he could hear it and stuff, and he knows when I'm upset. But [T.V.] hasn't really been around any of it.
...
Q Now, you were also asked earlier whether either of your children had been victims of domestic violence. As you think now, was there any incident that you left out when you responded to that question?
A Well, [B.R.] I know has been for sure.
Q Perpetrated by?
A Destry. And then Andrew in the beginning when he was a couple months old.
...
Q Was Mr. Renfro ever violent towards [B.R.] when the two of you were together?
A Not towards [B.R.], but it wasthe last incident with me was when [B.R.] was a baby.
¶ 45 As previously noted, the undisputed evidence also establishes that Vandermeer followed all treatment recommendations, engaged in all court-ordered services, and had taken steps to set boundaries and end her relationship with Renfro. Vandermeer testified that after the recent incident of Renfro's domestic violence against his spouse, Vandermeer *1129 realized he would not change and refused to get back together with him. Vandermeer took steps to prevent Renfro from contacting her by obtaining a new cell phone number and moving to an undisclosed location.
Q Had drinking been a problem for him in the past?
A It has, but I wasn't aware of any recent problems.
Q Okay. Now, did Mr. Renfro ask you to resume a relationship with him?
A Yeah. He said that he wanted us to be back together and work on doing things for the kids together. But I told him that I was already doing what I needed to do, and if we got back together, it wouldn't work because he wasn't following his services.
Q Okay. Now, was there any point where you realized that, although there appeared to have been changes in the way that Mr. Renfro conducted himself
A In March when he got out of jail for the domestic violence with his wife.
Q What did that tell you?
A That there was still problems. Because he came init was a couple days after he got out of jail he came into Safeway and he told me about it, and then he was asking me if he could stay with me, and I said no, that's not going to work. So that right there showed, even though he hasn't had any domestic violence recent with me, then that showed me that he didn't change.
Q Okay. And what does that mean to you about the possibility of you ever resuming a relationship?
A That he's still not safe to be around, and instead of his wife, it could have been me.
Q Okay. So you realize now that he would be an inappropriate partner for you?
A Yeah.
¶ 46 Because neither Dr. Freedman nor Springer had current information about the steps Vandermeer had taken to address relationships with potentially abusive partners, the trial court's reliance on their testimony is misplaced. There is no dispute that both Dr. Freedman and Springer last saw Vandermeer in 2008. When asked about Vandermeer's current ability to set limits, Dr. Freedman testified that his conclusion was based solely on the current documentation provided by DSHS.
Q Do you have an opinion as to whether the recommendation that you made for counseling and DV treatment had any impact or effect on the mother's ability to set boundaries in relationships and prioritize the needs of her children over her own and that sort of thing?
A My conclusions about that would be primarily based on reading the perceptions and assessments of others ... it seemed like little had changed since the time that I completed my evaluation. And considering how much treatment had occurred, I would have expected there to be a little bit more awareness and change in behavior.
...
Q Do you have an opinion as to the mother's present ability to be a safe parent to the [children]?
A I have to hedge my opinion, again, because I did not formally assess her parental capacity, so my conclusions about her potential to parent and risks to children in her care are based on my understanding of her psychological function. But that said ... my biggest concern is the ongoingapparently ongoing history of difficulty setting limits with men in her life whichwho may put the children or herself at risk. And I suppose that concern is made more critical by the fact that there has been a variety of different attempts at treatment and support, and there have also beenthere's also been the fact of the return of her children sort of is hanging in the balance, and yet change hasn't occurred and these issues have continued.
Q So do you believe she's presently able to safely parent, based on what you know?

*1130 A I'm uncomfortable answering the question in part because I haven't directly assessed that, and I would answer by saying, you know, in a vacuum, without other people and a broader context, perhapsI mean, there's no evidence to suggest that she herself abused her children or did them direct harm. However, people don't parent in a vacuum and have to parent in a context. And so while I'm uncomfortable making specific recommendations or observations about her as a parent, I can speak to the risk that I see from allowing men into her life who could potentially hurt the children if they were to be in her care.
But Dr. Freedman's conclusion that "little had changed with respect to Ms. Vandermeer's abilities to set limits with male partners" was based in part on the recent declaration of the DSHS caseworker that was excluded at trial. And on cross examination, Dr. Freedman also admitted that if Vandermeer had in fact resolved not to have any contact with Renfro, "I would laude [sic] that insight. I would, however, be concerned that the best indicator of ... future behavior is past behavior and so I would leave it at that."
¶ 47 This case is not like In re Dependency of S.M.H., 128 Wash.App. 45, 115 P.3d 990 (2005), where the mother was unwilling or unable to appreciate the significant risks her relationship with the father posed to the children and no additional services would make her see the danger posed by the father. S.M.H., 128 Wash.App. at 55, 115 P.3d 990.
¶ 48 Here, unlike in S.M.H., Vandermeer complied with all court-ordered services and participated in counseling and support groups for victims of domestic violence. During counseling and at trial, Vandermeer acknowledged the danger posed by Schnebly, recognized the need to extricate herself from her relationship with Renfro, and took steps that demonstrated she could set boundaries and protect her children from harm.
¶ 49 While it is undisputed that the foreseeable future for B.R. and T.V. is less than one year, clear, cogent, and convincing evidence does not support the conclusion that Vandermeer is unable to address the only identified parental deficiency within the foreseeable future.
¶ 50 Because DSHS has not met its burden of establishing current parental unfitness by clear, cogent, and convincing evidence, we reverse the order terminating Vandermeer's parental rights to B.R. and T.V.
WE CONCUR: SPEARMAN and BECKER, JJ.
NOTES
[1] We grant Vandermeer's motion to strike all references in the DSHS brief to the December 12, 2007 Commissioner's Ruling. See In re Welfare of Martin, 3 Wash.App. 405, 411-12, 476 P.2d 134 (1970).
[2] Vandermeer testified that Renfro had been drinking and forced her to have sexual intercourse with him.
[3] The court also found T.V. dependent as to Renfro, who did not respond to the dependency petition.
[4] During the dependency, B.R. and T.V. were placed in multiple foster homes.
[5] The termination petition as to T.V. is not in the record.
[6] We granted the motion of Legal Voice to file an amicus brief in this case.