115 P.3d 990 (2005)
In re the DEPENDENCY OF S.M.H. and J.C.H., Minor Children.
State of Washington, Department of Social and Health Services, Respondent,
v.
Marissa Hamm and Miguel Espiritu, Appellants.
Nos. 52643-0-I, 52684-7-I, 53141-7-I.
The Court of Appeals of Washington, Division One.
May 16, 2005.
Publication Ordered July 6, 2005.
*992 Laura Clinton, Preston Gates & Ellis LLP, Seattle, WA, Christopher Gibson, Attorney At Law, Seattle, WA, Thomas Harding Wolfendale, Preston Gates & Ellis LLP, Seattle, WA, for Appellants.
Catherine Cruikshank, Office of the Atty. General, Seattle, WA, Lori Irwin, King County Superior Ct/Dependency Casa, Seattle, WA, for Respondent.
SCHINDLER, J.
¶ 1 Marissa Hamm appeals the trial court's order terminating parental rights to her son, J.H. and her daughter, S.H. The trial court concluded Hamm was unwilling to appreciate the significant risk her relationship with S.H.'s father posed to J.H. and S.H. Hamm contends the Department of Social and Health Services (DSHS) failed to meet its burden of proving that (1) all services capable of correcting Hamm's parental deficiencies were provided; (2) there is little likelihood conditions will be remedied in the near future; (3) continuation of her relationship diminishes prospects for integration into a permanent home; and (4) termination is in the best interests of J.H. and S.H. Hamm also argues ineffective assistance of counsel. DSHS met its burden of establishing the statutory elements in RCW 13.34.180(1) by clear, cogent, and convincing evidence. Substantial evidence supports the trial court's determination that reasonable services were offered or provided by DSHS, Hamm is not likely to be able to parent J.H. and S.H. in the near future, further delay would diminish prospects for integration into a permanent home, and termination is in the children's best interest. We also conclude Hamm has not established ineffective assistance of counsel and we affirm.

FACTS
¶ 2 Marissa Hamm has struggled for many years with drug addiction and mental health disorders. Hamm attempted inpatient treatment several times before successfully participating in a methadone treatment program. Hamm has been diagnosed with bi-polar disorder, depression, and panic disorder.
¶ 3 In January 1998, Hamm had a relationship with William Goodloe and was living on the streets and using drugs. Hamm knew Goodloe was convicted in 1995 of child molestation in the first degree but believed the incident with the six-year-old girl was just a "a strange, drugged-out, freaky drug thing.'"[1] In January 1999 Hamm became pregnant.
¶ 4 In March 1999, Hamm entered a methadone program to overcome her heroin addiction. On July 10, 1999, J.H. was born prematurely and addicted to methadone. When J.H. was born, Hamm tested positive for drugs. J.H. required medical care for approximately four months and was given morphine to ease withdrawal. In July 1999, Goodloe was convicted of molesting another child and sentenced to 75 months in prison.
¶ 5 In August 1999, DSHS filed a petition for the dependency of J.H. On October 12, 1999, the court entered a dependency order and placed J.H. with his maternal grandparents. In the disposition order, Hamm was required to successfully complete drug treatment and obtain mental health counseling.
¶ 6 In January 2001, DSHS filed a petition to terminate the parental rights of Hamm and Goodloe. The court terminated Goodloe's parental rights but denied the request to terminate Hamm's rights because of the progress she had made in treatment. At the time, Hamm was living at Heath House, a clean and sober facility. The court ordered J.H. placed with Hamm. The court required Hamm to continue drug and alcohol treatment, mental health counseling, and attend parenting classes.
¶ 7 While living at Heath House, Hamm was in a relationship with Miguel Espiritu. *993 In early 2001, she became pregnant with Espiritu's child. Hamm was evicted from Heath House for several violations including having drugs and men in her room. On March 16, 2001, DSHS again placed J.H. with his grandparents.
¶ 8 In June 2001, when Hamm was living at BUDI House, a clean and sober facility, J.H. was placed with her again. While living at BUDI House, Hamm's drug tests were consistently negative and she was attending and making progress in court ordered treatment programs. In October 2001, Hamm was put on bed rest for pregnancy complications and J.H. was placed with his grandparents. J.H. has lived with his grandparents since then.
¶ 9 On November 21, 2001, Swedish Hospital reported that Hamm tested positive for cocaine. Hamm admitted that she smoked a marijuana cigarette sprinkled with cocaine. S.H. was born on November 28, 2001. Like J.H., S.H. was born addicted to methadone. S.H. received treatment for withdrawals for two months at the Pediatric Interim Care Center (PICC). When S.H. was released from PICC, DSHS placed her in foster care. S.H. has lived in foster care since then.
¶ 10 DSHS filed a petition for the dependency of S.H. on November 30, 2001. The allegations in the dependency petition describe the circumstances of the births of J.H. and S.H. and the referral from the hospital because Hamm tested positive for cocaine and marijuana while pregnant with S.H. The allegations also describe Espiritu's history of heroin addiction and child molestation allegations. DSHS learned Espiritu had been accused of molesting three young girls he lived with from 1991 to 1994.[2] DSHS referred Espiritu to Northwest Treatment Center to obtain a sexual deviancy evaluation and suggested Hamm obtain a restraining order against Espiritu. DSHS also informed Hamm about the child molestation allegations.
¶ 11 Espiritu obtained a sexual deviancy evaluation at the Northwest Treatment Center with Dr. Roger Wolff but refused to release the evaluation to DSHS until shortly before trial. During the evaluation, Espiritu admitted to sexually deviant behavior with a 10- or 11-year-old girl when he was 17 or 18 years of age. He also admits that he forced another girl to have sex with him on two occasions. Dr. Wolff evaluated Espiritu using psychological, polygraph and plethysmograph tests. In Dr. Wolff's opinion, Espiritu sexually abused or exploited four underage girls in the past, one clearly prepubescent, and "[he] is clearly very hedonistically oriented and has serious problems with regard to controlling his deviant sexual impulses towards ... children."[3]
¶ 12 In the disposition order entered in March 2002, the court ordered Espiritu to participate in drug and alcohol treatment, submit to random urinalyses, and participate in parenting classes and individual therapy. The order states the "[f]ather asserts his [5th] Fifth Amendment right not to release his sexual deviancy evaluation. However, father will not be considered as a placement resource in any way until the evaluation is released and all issues are addressed."[4] In the disposition order the court required Hamm to continue to participate in drug and alcohol treatment, obtain random urinalyses, attend parenting classes, and participate in mental health counseling. Because of Hamm's long-term relationships with men who engaged in sexually deviant behavior, the court ordered Hamm to attend nonoffender partner treatment and have no contact with Espiritu.
¶ 13 On September 5, 2002, Espiritu obtained another sexual deviancy evaluation from Dr. Douglas Allmon.[5] During this evaluation, Espiritu reported a sexual history that was different from the history he provided to Dr. Wolff.
¶ 14 In Dr. Allmon's opinion, Espiritu is sexually compulsive but amenable to treatment. Dr. Allmon concluded that until Espiritu successfully completes treatment for *994 sexual deviancy, he should have no unsupervised contact with any minor children.
¶ 15 After the disposition order was entered, Hamm made significant progress in overcoming her chemical dependency, completed parenting classes and participated in mental health counseling. According to the DSHS case worker:
She has definitely made lots of progress. From when we first met it wasthe drug abuse was really life threatening. It was hospitalizations to try to detox [sic] her from medication she shouldn't have been taking and those kinds of things, and she's definitely much more stable as far as her compliance with drug treatment and not using illegal drugs, housing is stable.[6]
¶ 16 In April 2002, DSHS referred Hamm to a nonoffender partner treatment program with Kathleen Kennelly. After five sessions, Hamm quit the program. After Hamm quit the nonoffender program with Kennelly, DSHS referred Hamm to a second nonoffender partner treatment program with Marsha Macy. Hamm began the program in December 2002, but quit that program after four sessions.
¶ 17 On September 9, 2002, Espiritu assaulted Hamm and was charged with fourth degree domestic violence assault. A no-contact order was issued by the court. DSHS scheduled supervised visits with S.H. for Hamm and Espiritu back-to-back. During the visits, the supervisor, Marilyn O'Brien, wrote detailed reports on how each parent interacted with S.H. and the interactions between Hamm and Espiritu.
¶ 18 In December 2002, DSHS filed a petition to terminate the parental rights of Hamm and Espiritu. In the termination petition DSHS acknowledged Hamm's compliance with her treatment programs but described serious concerns about her continuing relationship with Espiritu. Hamm refused to end her relationship with Espiritu and wanted him to help raise the children. She did not believe Espiritu posed a risk to J.H. and S.H. DSHS alleged Hamm could not protect J.H. and S.H. and that termination was in their best interests. DSHS alleged Espiritu had not complied with any court ordered services. He did not obtain drug and alcohol treatment or participate in parenting classes or counseling. Because Espiritu refused to release his sexual deviancy evaluation, DSHS stated it could not accurately assess his risk to the children.
¶ 19 In February and March 2003, Espiritu violated the no-contact order and assaulted Hamm on two separate occasions. Espiritu was arrested and remained in jail during the termination trial pending a criminal trial on domestic violence assault charges.
¶ 20 Shortly before the termination trial, Hamm registered for a nonoffender partner treatment program that she believed met her needs. After missing the first two sessions, Hamm was not allowed to participate in the program.
¶ 21 The termination trial began on May 27, 2003. A few days before the trial began, Espiritu agreed to release the sexual deviancy evaluations from Dr. Wolff and Dr. Allmon. At the conclusion of the trial, the court terminated Espiritu's parental rights to S.H. and terminated Hamm's parental rights to J.H. and S.H. Both Hamm and Espiritu appealed and filed motions for accelerated review. A commissioner granted the motions for accelerated review and affirmed the trial court's decision to terminate. Hamm and Espiritu each filed a motion to modify the commissioner's decision. Espiritu's motion was denied. We agreed to hear Hamm's appeal.

ANALYSIS

Standard of Review for Termination of Parent-Child Relationship
¶ 22 In order to terminate the parent-child relationship, DSHS must establish the statutory elements set forth in RCW 13.34.180(1)[7] *995 by clear, cogent, and convincing evidence and must find termination is in the best interests of the child. RCW 13.34.190(1)(a).
¶ 23 Evidence is clear, cogent, and convincing "when the ultimate fact in issue is shown by the evidence to be highly probable." In re Dependency of K.R., 128 Wash.2d 129, 141, 904 P.2d 1132 (1995) (internal quotations omitted). Where the needs of the child and the rights of a parent conflict, the needs of the child must prevail. This court will not disturb the trial court's findings if substantial evidence supports finding that the State has met the requisite burden of proof. In re Welfare of S.V.B., 75 Wash.App. 762, 768, 880 P.2d 80 (1994). Because the trial court has the advantage of observing witnesses, deference is particularly important in appellate review of termination decisions. See In re Aschauer, 93 Wash.2d 689, 695, 611 P.2d 1245 (1980); In re A.M., 106 Wash.App. 123, 131, 22 P.3d 828 (2001). That termination is in the best interest of the child must be shown by a preponderance of the evidence. RCW 13.34.190(1); In re A.M., 106 Wash.App. at 130, 22 P.3d 828.

Services Capable of Correcting Parental Deficiency in Foreseeable Future
¶ 24 Both RCW 13.34.180(1)(d) and RCW 13.34.231(4) obligate DSHS to offer or provide services that are capable of correcting parental deficiencies within the near future. It is well settled that additional services that might have been helpful need not be offered when a parent is unwilling or unable to make use of the services provided. In re J.W., 111 Wash.App. 180, 43 P.3d 1273 (2002). In re Dependency of T.R., 108 Wash.App. 149, 29 P.3d 1275 (2001).
¶ 25 Relying on In re Dependency of H.W., 92 Wash.App. 420, 961 P.2d 963 (1998), Hamm challenges the trial court's finding that the State provided all reasonably available services. Hamm contends that the two nonoffender treatment programs offered by the State were not structured for her particular needs because unlike the other women in those programs, neither Goodloe nor Espiritu molested her children. She also argues that DSHS made no attempt to help her complete the third program she found.
¶ 26 In In re H.W., the State failed to offer all reasonably available services to a developmentally disabled mother when it did not refer her to the Division of Developmental Disabilities (DDD) or to services "to assist her in understanding and identifying signs of sexual abuse." In re H.W., 92 Wash.App. at 421, 428-29, 961 P.2d 963.
¶ 27 Unlike In re H.W., DSHS referred Hamm to two different nonoffender partner treatment programs. After attending a few sessions, Hamm quit both programs. On her own initiative, Hamm found a third program that she felt was appropriate, but when she missed her first two sessions, she was not allowed to participate.
¶ 28 According to Kennelly and Macy, the purpose of a nonoffender treatment program is to work with women whose partners have sexually abused children to enable them to protect themselves and their children. Kennelly and Macy both testified that Hamm did not agree that she chose sex offenders as partners or that Espiritu posed a risk to her children. Hamm also testified that she did not believe Espiritu posed a risk to her children during the termination hearing.
¶ 29 Substantial evidence supports the trial court's finding that no additional service can make Hamm "see the danger Mr. Espiritu poses to her children."[8] DSHS provided all necessary services capable of correcting this parental deficiency in the foreseeable future. *996 DSHS referred Hamm to two nonoffender treatment programs both of which Hamm was either unwilling or unable to make use of. DSHS was not required to assist Hamm with the third program after she missed the first two sessions. See In re Dependency of P.A.D., 58 Wash.App. 18, 26, 792 P.2d 159 (1990).

Likelihood that Conditions Will be Remedied
¶ 30 RCW 13.34.180(1) requires DSHS to prove "there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future."[9] The focus of this factor is "whether parental deficiencies have been corrected." In re Dependency of K.R., 128 Wash.2d at 144, 904 P.2d 1132. If all necessary services reasonably capable of correcting the parental deficiencies within the foreseeable future are offered or provided and the deficiencies are not substantially improved within twelve months of the dependency order, there is a rebuttable presumption that this factor is established. RCW 13.34.180(1)(e).
¶ 31 Hamm contends DSHS did not prove by clear, cogent and convincing evidence that she did not understand the risk Espiritu posed to her children or that she continued to have a relationship with him.
¶ 32 The trial court found:
1.29 This mother is an extremely intelligent woman. She read the evaluations in evidence as exhibit # 11 and 12  the sexual deviancy evaluations for Miguel Espiritu. She simply could not absorb what she read. She minimized the evaluations in a shocking way in her testimony by saying something like `all guys think about is sex all the time.' She harbors the fantasy that she and Miguel, Jordan and Sierra will be a family.
1.30 There is little likelihood that conditions will be remedied so that the children can be returned to their mother within the near future. The CASA was correct when she observed that the mother is still completely enmeshed with the father. Even after the father was arrested for separate domestic violence charges in which she was the victim each time, the mother thought his arrest was unfair. She brought him clothes for this hearing. She gave the father money in February of this year when he demanded it and when, as she testified, she thought he would use the money to buy drugs. Then at the March 21, 2003 visit, the father insisted that his bottle of pills was in the glove compartment of the mother's car. She denied it but finally gave in to him and gave him her car keys to check. A few minutes later, the father returned with his bottle of prescription medication.
1.31 The mother has made remarkable progress but it has not been enough. There is no additional service that can make her see the danger Mr. Espiritu poses to her children. She plans to reunite with him and completely fails to see the risk to her children despite having read the two sexual deviancy evaluations and having listened to the father's testimony. She was to have no contact with him. But she has failed to sever her relationship with him. She is, as Ms. Kolvenbach noted, incapable of putting her children's needs before her own. She has chosen Mr. Espiritu over her children by having on-going contact with him.
¶ 33 Substantial evidence supports the trial court's findings. Hamm testified that she does not consider Espiritu a risk to her children and she does not think Espiritu has parental deficiencies other than drug use.[10] During Kennelly's nonoffender treatment program, Hamm said it was the twelve-year-old girl's fault Espiritu was accused of having oral sex with her. Hamm told the visitation supervisor that Espiritu's contact with the young girls was just a youthful indiscretion and he posed no danger to children. While attending Macy's non-offender treatment program, Hamm described Espiritu as being railroaded.[11] Hamm read both sexual deviancy evaluations. Although Hamm is extremely intelligent, when asked whether the *997 Wolff and Allmon evaluations of Espiritu caused her concern, she said she was just a lay person and didn't understand the "mumbo-jumbo" in the evaluations.[12]
¶ 34 Substantial evidence also supports the trial court's findings that Hamm and Espiritu continued to be involved with one another despite the no-contact order and that Hamm intended to reunite with him. O'Brien, the visitation supervisor, testified that Hamm admitted to having contact with Espiritu. According to O'Brien, Hamm and Espiritu used the visits with S.H. as an opportunity to have contact with each other. O'Brien also testified that their conversations indicated they had an on-going relationship. The Court Appointed Special Advocate for S.H. and J.H. testified that Hamm and Espiritu were in contact despite the no-contact order, that they loved each other and wanted to be together. And during the termination trial, Hamm took clothes to Espiritu at the jail and introduced herself as Espiritu's partner.
¶ 35 DSHS proved Hamm is unable to comprehend the risk posed to her children by Espiritu, Hamm refuses to sever her relationship with Espiritu and continues to have a relationship with him, and there is little likelihood that Hamm's parental deficiencies can be remedied in the near future. Substantial evidence supports the trial court's findings that there are no additional services that can make Hamm accept the danger Espiritu poses.
¶ 36 Hamm also contends that even if Espiritu poses a risk to S.H., substantial evidence does not support the trial court's decision that Espiritu poses a risk to J.H.[13] We disagree. Dr. Wolff concluded Espiritu "has serious psychological problems and has committed aggressive and violent behaviors in addition to his sex deviance problem."[14] Dr. Wolff's evaluation also describes Espiritu as "sexually obsessed."[15] Although Wolff believed Espiritu "probably is less of a risk to male children," he stated he could not recommend that Espiritu have "unsupervised contact with any child."[16]
¶ 37 Dr. Allmon concluded that Espiritu should have no contact with children of either sex until he successfully completes tailored treatment for sexual deviancy.[17]
... will have no unsupervised contact with minor females. Nothing will prevent him from having unsupervised contacts with male minors. No contact whatever with any minor, regardless of sex, will be permitted during any period when Mr. Espiritu does not remain enrolled satisfactorily in both tailored treatment for sexual deviancy and any required treatment for substance abuse.[18]
¶ 38 Substantial evidence supports the trial court's findings that Espiritu's untreated sexual deviancy poses a risk not only to S.H. but also to J.H.[19]

Effect of Continuing Relationship on Prospects for Early Integration
¶ 39 DSHS must prove that "continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home." RCW 13.34.180(1)(f). This finding "necessarily follows from an adequate showing" that there is little likelihood that conditions will be remedied so that children can be returned to the parent in the near future. In re Dependency J.C., 130 Wash.2d 418, 427, 924 P.2d 21 (1996).
¶ 40 The trial court found that continuing Hamm's parent-child relationship with S.H. and J.H. clearly diminishes their prospects *998 for early integration into stable and permanent homes. S.H. was two and a half years old at the time of trial and has been in foster care her entire life. J.H. was almost four years old at the time of trial and has been in foster care all but about six months of his life.
¶ 41 Relying on In re Welfare of S.V.B., 75 Wash.App. 762, 880 P.2d 80 (1994), Hamm contends that continuation of her relationship with S.H. and J.H. does not diminish their prospects for early integration because they are currently in potentially permanent homes and Hamm's parental rights are not interfering with their placements.
¶ 42 S.V.B. is distinguishable. In S.V.B., the court found that the parent-child relationship did not diminish prospects for early integration because the dependent child lived with his paternal grandmother under a court-established guardianship. Id. at 775, 880 P.2d 80. Here, unlike S.V.B., no dependency guardianship was requested or established. See In re J.C., 130 Wash.2d at 427, 924 P.2d 21; In re Dependency of T.R., 108 Wash.App. 149, 166, 29 P.3d 1275 (2001). The court's determination that J.H. and S.H. have lived in limbo their entire lives and deserve permanency and stability is supported by the substantial evidence in the record.

Child's Best Interests
¶ 43 If the factors in RCW 13.34.180 are proved by clear, cogent and convincing evidence, the trial court then considers whether DSHS has proved by a preponderance of the evidence that termination of the parent-child relationship is in the child's best interest. RCW 13.34.190(1),(2).
¶ 44 The dominant consideration in determining the best interests of a child is the child's welfare, and the parental relationship must be subordinate to this consideration. In re J.W., 90 Wash.App. at 427, 953 P.2d 104. A child has "the right to a safe, stable, and permanent home and a speedy resolution of any proceedings under this chapter." RCW 13.34.020.
¶ 45 The trial court concluded DSHS proved termination of the parent-child relationship was in the best interest of J.H. and S.H. The court found Hamm did not place the needs of J.H. and S.H. first and refused to sever her relationship with Espiritu or recognize the threat he posed to her children.
¶ 46 Hamm relies on testimony that she has made significant progress in addressing her parental deficiencies and that she has a loving relationship with her children to argue DSHS did not meet its burden. But Hamm's argument ignores the testimony that establishes her unwillingness to address the risk to her children posed by Espiritu and her continued contact with him.
¶ 47 When a parent has not been able to address parental deficiencies over a lengthy dependency, a court is "fully justified" in finding termination is in the childs best interests. In re A.W., 53 Wash.App. 22, 33, 765 P.2d 307 (1988). We hold DSHS proved the factors in RCW 13.34.180 by clear, cogent and convincing evidence and affirm the trial courts decision that termination is in the best interest of J.H. and S.H.

Ineffective Assistance of Counsel
¶ 48 Hamm claims her lawyer was ineffective because he failed to seek recusal of the of the trial judge. When Kennelly was identified as a witness, the judge disclosed she was inclined to believe Kennelly was telling the truth because she knew the witness in a professional capacity and had a close friend in common with her.[20]
¶ 49 To establish ineffective assistance of counsel, a party must show deficient performance and resulting prejudice. State v. Turner, 143 Wash.2d 715, 730, 23 P.3d 499 (2001). Counsel's performance is deficient if it falls "below an objective standard of reasonableness based on consideration *999 of all of the circumstances." State v. Thomas, 109 Wash.2d 222, 226, 743 P.2d 816 (1987). To satisfy the prejudice prong, a party must show a "reasonable probability that, but for counsels unprofessional errors, the result of the proceedings would have been different." Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "Scrutiny of counsels performance is highly deferential and courts will indulge in a strong presumption of reasonableness." State v. Thomas, 109 Wash.2d at 225-26, 743 P.2d 816(citing Strickland, 466 U.S. at 689, 104 S.Ct. 2052). If counsels conduct can be characterized as legitimate trial strategy, it cannot provide a basis for a claim of ineffective assistance of counsel. State v. Aho, 137 Wash.2d 736, 745, 975 P.2d 512 (1999).
¶ 50 Hamm argues that after the following exchange took place at trial, her attorney should have asked the judge to recuse herself:
THE COURT: Ms. Kennelly also works for the court, is that correct, Ms. Kennelly?
THE WITNESS: That is correct.
THE COURT: I would like that disclosed, that Ms. Kennelly works for family court services part time and 
THE WITNESS: Full time, actually.
THE COURT: That was what I thought, but then I saw this other, and is a case worker on unified family court, which I serve on, so I do have a professional relationship with Ms. Kennelly.
MS. CRUIKSHANK: Okay.
THE COURT: I don't know whether anyone wants to do anything about that, but I was not sure if it was the same person when I looked at the notes, because I saw this from Northwest Treatment Associates and was not aware that it was the same person.
MR. SALAZAR: Your Honor, I'll just, for the record, indicate that does the court believe that it can, in spite of that, render a fair decision in this case?
THE COURT: I will tell you, I do have a preconception about Ms. Kennelly's honesty. I don't know if credibility's an issue.
MR. SALAZAR: I don't believe so. I am basing that only on fact.
THE COURT: If credibility is at issue, we have a problem. If what she is doing is reporting fact, and you can all let me know beyond that, it's just someone who is  whom I have worked with, and it's not the same person as a stranger, and I would be inclined to believe Ms. Kennelly is telling the truth.
MR. SALAZAR: I don't think that is going to be an issue.
MS. CRUIKSHANK: I don't think credibility's an issue.
THE COURT: I suppose it's  well I am inclined to believe Ms. Kennelly.
MS. CRUIKSHANK: I think you are equally predisposed to other people before you.
THE COURT: I don't have predisposition, but I do want to indicate Ms. Kennelly is someone I worked with professionally in court.[21]
¶ 51 As Hamm points out, the judge initially explained that she would be inclined to believe Kennelly's testimony. However, Hamm overlooks what the trial judge said after Kennelly testified.
THE COURT: Thank you very much. I am satisfied that although I do know Ms. Kennelly personally, then also realized that we do have a close friend in common and had very minor social contact, probably 10 years ago, it's been quite a while, at a birthday party, that none of this will impact me, given the tenor of her testimony. Is anyone seeking my recusal?
MR. SALAZAR: No, Your Honor. I believe that there is no conflict.[22]
¶ 52 Hamm also argues that her lawyer's decision to not seek recusal was deficient because he knew Kennelly's testimony would be adverse. But Kennelly's testimony was *1000 undisputed and the same information was testified to by other witnesses.[23]
¶ 53 Considering the circumstances, we conclude Hamm has not established that her lawyer's decision to not seek recusal of the trial judge was deficient performance that resulted in prejudice.

CONCLUSION
¶ 54 DSHS met its burden of establishing the statutory elements by clear, cogent, and convincing evidence to terminate Hamm's parental rights as to S.H. and J.H. and substantial evidence supports the trial court's decision to terminate Hamm's parental rights. Hamm failed to show her counsel provided ineffective assistance of counsel. Accordingly, we affirm the trial court's decision.
WE CONCUR: ELLINGTON, A.C.J., and COLEMAN, J.
NOTES
[1] Clerk's Papers (CP) at 254.
[2] Espiritu was not criminally prosecuted.
[3] Petitioner's Exhibit No. 11.
[4] Pet. Ex. 8, at 10.
[5] Pet. Ex. 12.
[6] Report of Proceedings (RP) (05/29/03) at 531.
[7] The statutory elements are, in pertinent part:

(a) That the child has been found to be a dependent child;
(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
(c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future ....; and
(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.
[8] RP (05/29/03) at 434.
[9] RCW 13.34.180(1)(e).
[10] RP (05/29/03) at 433-34.
[11] RP (05/28/03) at 313.
[12] Hamm also stated that "if [Espiritu] had done something so serious, why didn't he get put in jail? Why wasn't he arrested?" RP (06/02/03) at 626.
[13] Supplemental Brief of Appellant at 7.
[14] Pet. Ex. 11, at 10.
[15] Pet. Ex. 11, at 10
[16] Pet. Ex. 11, at 15.
[17] While Allmon's evaluation is internally inconsistent, it clearly states that without treatment, Espiritu should not have contact with any minor children.
[18] Pet. Ex. 12, at 14-15 (emphasis added).
[19] In addition, the record shows Espiritu poses a risk because of his drug and alcohol addictions and domestic violence assaults of Hamm.
[20] In her Reply Brief, Hamm also argues for the first time that the court's preconception of Kennelly violated Hamm's rights under RCW 13.34.090(1). Reply Brief of Appellant at 18. Issues raised for the first time in a reply brief will not be considered on appeal. See Cowiche Canyon Conservancy v. Bosley, 118 Wash.2d 801, 809, 828 P.2d 549 (1992); see also RAP 10.3(c); State v. Dhaliwal, 150 Wash.2d 559, 575 n. 11, 79 P.3d 432 (2003); State v. Karas, 108 Wash.App. 692, 702, 32 P.3d 1016 (2001).
[21] RP (05/28/03) at 365-67.
[22] RP (05/28/03) at 388.
[23] The DSHS caseworker testified that Hamm attended and quit Kennelly's program because she did not believe Espiritu was a child molester or that he posed a risk to her children. Hamm testified that she briefly attended Kennelly's group and that she quit the program because it was irrelevant to her life.