IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | |
|---|---|
| In re the Welfare of: | No. 32084-7-III |
| | Consolidated with |
| A.K.J.M.W., | No. 32089-8-III |
| DOB: 01/03/10 | |
| | UNPUBLISHED OPINION |
| A person under the age of eighteen years. | |

BROWN, A.C.J. — E.A. (mother) and L.W. (father) appeal the juvenile court's order terminating their parental rights over A.K.J.M.W. (A.W.). E.A. first contends substantial evidence does not support the court's findings that (A) under RCW 13.34.180(1) all necessary services were expressly and understandably offered or provided; and next she contends little likelihood exists conditions would be remedied so A.W. could be returned to E.A. in the near future; and (B) under RCW 13.34.190(2) it was in A.W.'s best interest to terminate her mother's parental rights. Additionally, E.A. contends (C) there was ineffective assistance of counsel and (D) a public trial right violation. L.W. joins in B and C, and separately contends (E) he was denied constitutional due process by deficient notice of the rescheduled termination trial. Because the record supports each challenged finding, and we find no reversible constitutional error, we affirm.

No. 32084-7-III cons. w/ 32089-8-III
*In re Welfare of A.K.J.M.W.*

FACTS

In July 2011, the Department of Social and Health Services (DSHS) removed A.W. from L.W. and E.A.'s home and filed a dependency petition based on the parents' domestic violence in the presence of A.W. and A.W.'s exposure to drugs and prostitution. On October 13, 2011, the parents agreed to a dependency order and agreed to participate in drug and alcohol evaluations, random urinalysis (UAs), parenting education, and a domestic violence assessment. The mother agreed to complete a mental health evaluation. DSHS social worker Tara Camp made referrals for necessary services. From the time of dependency to termination, DSHS offered the following services to help the parents:

1. *Substance abuse services provided to E.A.* On October 7, 2011, chemical dependency counselor Susan Tempel evaluated E.A. for substance abuse. During the evaluation, E.A. reported daily use of marijuana over the past year, but stated she stopped using it in May 2011. When Ms. Tempel informed E.A. of her intent to recommend intensive outpatient treatment, E.A. became upset, agitated, verbally abusive, and failed to complete the evaluation.

In November 2011, chemical dependency counselor Linda Gonzalez conducted a second substance abuse evaluation. E.A. reported her drug and alcohol use began at age 14, but she did not feel she had a chemical dependency problem. During her first appointment, E.A. was very defensive and did not return again until January 2012.

2

Based upon her interview with E.A., testing, and her collateral contacts, Ms. Gonzalez diagnosed E.A. as alcohol and cannabis dependent and recommended she participate in intensive outpatient treatment, followed by a relapse prevention program. Ms. Gonzalez estimated this treatment program would take one year. E.A. never attended treatment sessions, and Ms. Gonzalez closed her file in February 2012. In May 2012, E.A. participated in intensive outpatient treatment with chemical dependency counselor John Winston. While she initially did fine, she later became hostile and angry during a group session, yelling and swearing at Mr. Winston in an uncontrollable manner. E.A. was discharged from the program after three weeks due to her behavior. E.A.'s social worker encouraged E.A. to seek treatment with another provider and on July 13, 2012, E.A. participated in a substance abuse evaluation with chemical dependency counselor Michelle Roberts. E.A. reported she had used marijuana and alcohol, indicating her last use of marijuana was December 31, 2010. Ms. Roberts did not feel E.A. was honest. Ms. Roberts was unable to form a diagnosis or treatment recommendation because E.A.'s defensiveness score was too high.

Later in July 2012, E.A. participated in a substance abuse evaluation at Sundown M. Ranch. E.A. reported primary use of marijuana, a prior attempt at outpatient treatment, a prior mental health diagnosis, and a current pregnancy. Sundown staff diagnosed her as chemically dependent, but reported to be in remission. However, E.A.'s defensiveness score on testing indicated she might not be candidly reporting information. Following the assessment, E.A. was admitted to outpatient treatment.

3

Beginning on August 3, 2012, E.A. participated in an intensive outpatient treatment group at Sundown with treatment provider by Jari Hickman. E.A. was required to attend group four times per week, three hours per session, and was aware she risked discharge for noncompliance. During group sessions, E.A. was argumentative and defensive. She was discharged from the program on August 28, 2012 for failure to regularly attend the program. Sundown treatment directors determined E.A. should participate in inpatient treatment. The outpatient treatment director attempted to reach E.A. to discuss inpatient treatment, but E.A. did not return the call and never returned to the treatment facility. On October 25, 2012, E.A. submitted to a random UA, which tested positive for marijuana and amphetamines. She tested positive again for marijuana in March 2013.

2. *Domestic violence and anger management services provided to E.A. and L.W.* Domestic violence treatment provider, Reynaldo Chavez, received a referral to assess E.A.'s anger management in October 2011. E.A. suffered a dysfunctional childhood, growing up in an extremely violent home. She experienced instability in her relationships including violence, domestic violence, and physical and emotional abuse. She described her relationship with L.W. as unstable, characterized by conflict and turmoil.

E.A. disclosed the couple was verbally and physically aggressive toward each other. Mr. Chavez's testing showed E.A. expressed anger explosively. He explained such an individual has poor skills to cope with stress, frustration, depression, anxiety,

4

and parenting. When such a person blows up, the resulting anger can be physical, verbal, and very violent. He recommended E.A. participate in a minimum one-year program to help her understand the impact of violence on her life and on her child, and to identify ways to break the cycle and provide a positive nurturing environment.

Shortly after he completed E.A.'s assessment, Mr. Chavez started providing her domestic violence education. E.A. attended inconsistently, frequently canceling appointments. Mr. Chavez closed her case in March 2012. From November 2011 through March 2012, E.A. made no progress towards the program goals. At closure, she still needed at least another year of domestic violence treatment. E.A. and L.W.'s relationship remained volatile during this time period. In March 2012, therapist Tawnya Wright noted visible bruising on E.A.'s neck. Ms. Wright attempted to talk with E.A. about the impact of domestic violence on A.W., without progress.

DSHS then referred E.A. to domestic violence treatment provider Rose Roberson who met with E.A. for 10 sessions from April 25, 2012 to July 12, 2012. She was regularly rescheduling E.A.'s sessions to try to accommodate E.A.'s consistent cancellations. Ms. Roberson noted E.A. appeared guarded, minimizing the seriousness of her relationship with L.W. She identified E.A.'s problem as pervasive. Ms. Roberson suspected E.A. had an underlying bipolar disorder and believed a therapist could not be effective until E.A. was medically stabilized. Ms. Roberson terminated E.A. from services, but assessed E.A. still had anger management problems.

5

DSHS referred L.W. to Ms. Roberson. She noted L.W. tended to minimize the seriousness of his behavior. Ms. Roberson recommended L.W. participate in a six-month anger management program and participate in random UAs. In March 2012, Ms. Roberson suspended L.W. from her program due to missed appointments. Police arrested L.W. on domestic violence charges later that month and Ms. Roberson was asked to reinstate him in her program. Ultimately, he stopped attending; services were terminated in September 2012. At the time of the termination hearing, L.W. was incarcerated in a Texas jail for pending domestic violence charges.

3. *Mental health services provided to E.A.* Following entry of the dependency disposition order on A.W., E.A. participated in a mental health exam at Central Washington Comprehensive Mental Health, and the evaluator recommended mental health treatment. On March 3, 2012, therapist Patricia Byers assessed E.A. and determined she was moderately depressed and suffered from post-traumatic stress disorder (PTSD). For treatment to be successful, Ms. Byers noted E.A. would need to be clean and sober. Ms. Byers developed a treatment plan with E.A. and estimated treatment would span one to two years, assuming E.A. was fully engaged. At the end of their 16 sessions, Ms. Byers did not feel E.A. met their treatment goals. During their last session on September 15, 2012, E.A. became very angry and verbally abusive toward Ms. Byers and was unable to deescalate; Ms. Byers had to ask her to leave the office. E.A. did not return for any more sessions.

6

E.A. then self-referred to Doug Cheatham, another mental health counselor. E.A. wanted Mr. Cheatham to provide her domestic violence counseling, but Mr. Cheatham was not a state-certified domestic violence provider. The dependency court determined E.A. could see Mr. Cheatham for counseling, but not for domestic violence counseling. E.A. did not accept her social worker's offer to make a referral to a Yakima domestic violence counseling provider. E.A. stopped seeing Mr. Cheatham when she moved to Texas in March 2013.

*4. Psychological and psychiatric evaluations for E.A.* On May 3, 2012, psychologist Naughne Boyd assessed E.A. E.A.'s test profile was consistent with a person who initially had positive interactions with a service provider but if challenged, could turn hostile, angry, or explosive. E.A.'s three problem areas included domestic violence, marital problems, and her assaultive history. Dr. Boyd explained to benefit from treatment, E.A. would need to feel liked, trusted, and believed by her therapist. Dr. Boyd said it would be reasonable to expect E.A. would have periods where she would maintain and comply with a service provider, followed by periods of noncompliance. E.A.'s repression of her shortcomings made diagnosis somewhat difficult. Dr. Boyd diagnosed marijuana dependency, in remission, PTSD symptoms (but not necessary the disorder), possible bipolar disorder, strong indications of histrionic personality traits and narcissistic. As a result of her assessment, Dr. Boyd concluded E.A. had significant issues with anger management as reflected in her domestic violence issues. While E.A. was friendly and outgoing, she could quickly become irrational and angry. Dr. Boyd

7

noted evidence of E.A.'s willingness to distort the truth to get what she wanted. Dr. Boyd opined when E.A. was involved in a fight or caught up in emotion, she could not pay attention to her child's needs. Dr. Boyd recommended E.A. participate in and complete all recommended services including anger management, individual therapy, parenting education, and random UAs. Dr. Boyd recommended referral to a psychiatrist to fine tune E.A.'s diagnosis and make appropriate medication recommendations.

In August 2012, E.A. contacted psychiatrist Dr. Philip Rodenberger. She requested a psychiatric evaluation and notified him of the DSHS's involvement in her services. Dr. Rodenberger requested additional background information from DSHS, which the parties' current social worker, Angela Gonzalez,[1] provided. Dr. Rodenberger requested E.A. complete a drug and alcohol evaluation before completing the psychiatric evaluation with him. E.A. did not participate in the requested drug and alcohol evaluation and did not return to Dr. Rodenberger to complete the psychiatric evaluation.

5. *Parenting assessments provided to E.A. and L.W.* DSHS asked therapist, Tawnya Wright, to assess E.A. and L.W. for parenting needs. Ms. Wright was unable to complete L.W.'s assessment due to multiple incarcerations and work conflicts. She evaluated E.A. in February 2012. The tests showed E.A. experienced a significant amount of stress in her life to a point it might interfere with parenting. Ms. Wright observed E.A. often expressed anger and disdain for DSHS and most professionals

---

[1] Angela Gonzalez's full name is used to distinguish from Linda Gonzalez, E.A.'s chemical dependency counselor.

involved with the case. In her parenting assessment recommendations, Ms. Wright recommended E.A. comply with service requirements, including domestic violence or anger management treatment and parenting education services. Although E.A. had periods of positive interaction with A.W. during visits, her mental health and behaviors worsened. Ms. Wright noted E.A.'s anger prevented her from recognizing when professionals were trying to help her.

At the end of July 2012, during a scheduled parenting session with Ms. Wright and A.W., E.A. left the building with A.W. When confronted by a social worker outside the building, E.A. began screaming at the social worker while A.W. slumped, put her head down, and did not say anything. As a result of this incident, Ms. Wright discontinued sessions with E.A. until she received mental health intervention, could stabilize her behavior, and was not so explosive and potentially dangerous.

In 2013, E.A. and L.W. moved to Texas, leaving A.W. in foster care in Washington. Soon after arriving, E.A. gave birth to a son. Texas social service investigator Jennifer Leal met with the parents in Texas on March 11, 2013, to investigate a referral concerning E.A. and L.W.'s neglectful supervision of their newborn son. The referral alleged the family arrived in Texas from Colorado, and the mother and child tested positive for marijuana at the child's birth.

On March 12, 2013, L.W. called to speak with Angela Gonzalez, the parties' social worker back in Washington. During the conversation, L.W. denied knowledge of the birth of his son and said he had no contact with E.A., again indicating he was in

9

California. On March 14, 2013, after E.A. was allowed to return home from the hospital with her newborn son, another referral was made to Texas authorities, and the investigators assigned to the case removed the infant from E.A. and L.W.'s care.

Based on the negative course of the above services, DSHS petitioned to terminate E.A. and L.W.'s parental rights over A.W; both parents were personally served with the petition and requested counsel. Both parties' attorneys unsuccessfully requested continuances, arguing "[m]ultiple relatives have emerged and are willing to be a placement for the child." Clerks' Papers (CP) at 144, 148. The termination trial was set for June 3, 2013, but due to a conflict arising on the second day of trial, the trial judge recused herself, declaring a mistrial. A new judge was assigned and proceeded under the same cause number. On June 5, 2013, the court rescheduled trial to September 16, 2013. The status conference order was approved by L.W.'s attorney. Our record shows no evidence of any relative requesting guardianship between June and September.

At trial in September 2013, neither parent appeared. Ms. Leal testified that while investigating allegations of negligence relating to the parties' newborn son in Texas, E.A. admitted using marijuana again, but claimed it was for nausea. L.W. admitted using marijuana approximately two weeks before. Another Texas social worker, Melloney Arnett, testified her last communication with L.W. was two weeks prior to the termination trial. She met with him at the county jail where he was incarcerated for domestic violence against E.A. She spoke with him about the termination of parental

10

rights trial in Washington. While Ms. Arnett did not provide written notice, she verbally informed him of the rescheduled September trial date.

A.W.'s guardian ad litem (GAL), Mimi Fuzi, testified she noted E.A. had not seen A.W. for over a year. In March 2013, L.W. told A.W. he was going to California for a month but never returned. Ms. Fuzi testified A.W.'s foster home was "loving, nurturing, appropriate. They adore her." Report of Proceedings (RP) at 498. Ms. Fuzi recommended termination of E.A and L.W.'s parental rights because their domestic violence, drug use, homelessness and instability was no good for A.W.

Angela Gonzalez described the parents' participation in services as sporadic and not fully engaged. She testified the parents were currently unfit to parent A.W. based on untreated, ongoing domestic violence issues, ongoing mental health issues, drug and alcohol issues, the unstable living environment, the explosive relationship between E.A and L.W., and sporadic participation in services. She opined it was unlikely A.W. could be returned to their care.

After a five-day trial, the court terminated E.A. and L.W.'s parental rights, finding substantial evidence supported the RCW 13.34.180(1) factors, termination was in A.W.'s best interests, and the parents were unfit. Both parents appealed.

ANALYSIS

A. Statutory Elements of RCW 13.34.180(1)

The issue is whether substantial evidence supports the trial court's findings under RCW 13.34.180(1).

11

Parents have a fundamental liberty interest in the care, custody, and companionship of their children. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). As such, the State may interfere with parents' rights "only for the most powerful of reasons." *S.J.*, 162 Wn. App. 873, 880, 256 P.3d 470 (2011) (quoting *In re Welfare of A.J.R.*, 78 Wn. App. 222, 229, 896 P.2d 1298 (1995)). When the parental actions may cause harm or a risk of harm to the child, the State has a right and responsibility to protect the child. *A.J.R.*, 78 Wn. App. at 229; *In re Custody of Smith*, 137 Wn.2d 1, 18, 969 P.2d 21 (1998). Therefore, "reunification must be balanced against the child's right to basic nurture, physical and mental health, and safety; ultimately, the child's rights and safety should prevail." *In re Welfare of A.G.*, 155 Wn. App. 578, 588, 229 P.3d 935 (2010).

Washington courts use a two-step process to determine whether to terminate parental rights. RCW 13.34.180(1); *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). The first step focuses on the adequacy of the parents and requires the State to prove the six statutory elements of RCW 13.34.180(1) by clear, cogent and convincing evidence. RCW 13.34.190(1)(a); *A.B.*, 168 Wn.2d at 911. The six statutory elements required by the first step are as follows:

(a) That the child has been found to be a dependent child;
(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
(c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the

12

   reasonable future have been expressly and understandably offered or
provided;

(e) That there is little likelihood that conditions will be remedied so that the child
can be returned to the parent in the near future. A parent's failure to
substantially improve parental deficiencies within twelve months following
entry of the dispositional order shall give rise to a rebuttable presumption that
there is little likelihood that conditions will be remedied so that the child can
be returned to the parent in the near future.

(f) That continuation of the parent and child relationship clearly diminishes the
child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1). Elements (d) and (e) are disputed here.

We must affirm findings of fact under RCW 13.34.180(1) if supported by

substantial evidence from which a rational trier of fact could find the necessary facts by

clear, cogent and convincing evidence. *In re Dependency of K.S.C.*, 137 Wn.2d 918,

925, 976 P.2d 113 (1999). Evidence is substantial if it is sufficient to persuade a fair-

minded person of the truth of the matter asserted. *S.J.*, 162 Wn. App. at 881. Clear,

cogent and convincing evidence exists when the ultimate fact at issue is "highly

probable." *K.S.C.*, 137 Wn.2d at 925. Because the trial court hears the testimony and

observes the witnesses, it is entitled to deference. *In re Welfare of L.N.B.-L.*, 157 Wn.

App. 215, 243, 237 P.3d 944 (2010). As such, we will not judge the credibility of

witnesses or weigh the evidence. *Id.* The party claiming error has the burden of

showing that a finding of fact is not supported by substantial evidence. *Fisher*

*Properties v. Arden-Mayfair*, 115 Wn.2d 364, 369, 798 P.2d 799 (1990).

First, E.A. contends DSHS failed to meet its burden to understandably necessary

offer or provide services according to RCW 13.34.180(1)(d). Specifically, she argues

DSHS failed to offer psychiatric services and medication management. To meet its

13

burden under RCW 13.34.180(1)(d), DSHS must show it offered or provided E.A. the required services and that E.A. either failed to engage or waived her right to such services. *In re Welfare of S.V.B.*, 75 Wn. App. 762, 770, 880 P.2d 80 (1994). The services offered or provided must be tailored to the individual parent's needs. *In re Dependency of T.R.*, 108 Wn. App. 149, 161, 29 P.3d 1275 (2001). The court may consider any service received, from whatever source, if it relates to the potential correction of a parental deficiency. *In re Dependency of D.A.*, 124 Wn. App. 644, 651-52, 102 P.3d 847 (2004). A parent's unwillingness or inability to avail herself of remedial services within a reasonable period is highly relevant to a court's determination of whether the elements of RCW 13.34.180 are established. *In re Dependency of C.T.*, 59 Wn. App. 490, 499, 798 P.2d 1170 (1990).

Here, DSHS provided a mental health evaluation, mental health counseling, and a psychological evaluation. E.A. argues she needed psychiatric services versus psychological services. Psychiatrist Dr. Rodenberger started an evaluation and then requested background information from DSHS, which DSHS readily provided. Dr. Rodenberger agreed to meet with E.A. again, but asked she participate in a substance abuse evaluation first. E.A. did not participate in the substance abuse evaluation, did not return to the psychiatrist,[2] and moved out of state to live in Texas, where her location was unknown at trial. If a parent is unwilling or unable to make use of the services offered or provided like E.A., DSHS is not required to offer other services that

_____

[2] Testimony that E.A. returned two months later for a medical marijuana card was stricken.

14

might have been helpful. *In re Dependency of S.M.H.*, 128 Wn. App. 45, 54, 115 P.3d 990 (2005).

Thus, substantial evidence supports the trial court's finding that DSHS offered all reasonably available, necessary services in an attempt to correct the mother's parental deficiencies. The mother participated in, but did not finish, a psychiatric evaluation and was unable to make necessary change in a timely manner.

Second, E.A. contends DSHS failed to prove by substantial evidence that little likelihood existed her parental deficiencies would be remedied so A.W. could be returned to her in the near future under RCW 13.34.180(1)(e). E.A. argues proper services were not offered. DSHS must prove "that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." RCW 13.34.180(1)(e). The focus of this element is whether the identified deficiencies have been corrected. *In re Welfare of M.R.H.*, 145 Wn. App. 10, 27, 188 P.3d 510 (2008).

If E.A. is unable to resolve her deficiencies within 12 months after the child has been declared dependent, the statute's rebuttable presumption applies and the burden of production shifts to the parent. *In re Welfare of T.B.*, 150 Wn. App. 599, 608, 209 P.3d 497 (2009). DSHS must still prove it is highly probable the parent would not improve in the near future. *Id.* One factors the court may consider is, "Psychological incapacity or mental deficiency of the parent that is so severe and chronic as to render the parent incapable of providing proper care for the child for extended periods of time

15

or for periods of time that present a risk of imminent harm to the child, and documented unwillingness of the parent to receive and complete treatment or documentation that there is no treatment that can render the parent capable of providing proper care for the child in the near future." RCW 13.34.180(1)(e)(ii). "A parent's unwillingness to avail herself of remedial services within a reasonable period is highly relevant to a trial court's determination as to whether [DSHS] has satisfied RCW 13.34.180(1)(e)." *T.B.*, 150 Wn. App. at 608. Even if some evidence suggests E.A. may eventually be capable of correcting her deficiencies, termination is still appropriate where the deficiencies will not be corrected within the foreseeable future. *In re Welfare of A.G.*, 155 Wn. App. 578, 590, 229 P.3d 935 (2010).

As discussed above, DSHS offered necessary services to E.A. but she was unwilling to make use of them in the almost two years A W. was in out-of-home care. E.A. unpersuasively argues her parental deficiencies were corrected. Our record belies that argumentative assertion. She continued to struggle with anger management and drug use, left Washington State, and her whereabouts were unknown at trial. Instead, the overwhelming evidence shows all necessary services were offered without sufficient progress to suggest E.A.'s parental deficiencies would likely be remedied in the foreseeable future. When progress has not been made in 12 months following dependency, a rebuttable presumption rises that little likelihood exists conditions will be remedied so that the child can be returned to the parent in the near future. *T.B.*, 150

16

Wn. App. at 608. Because E.A. failed to produce evidence rebutting the presumption, substantial evidence supports the court's RCW 13.34.180(1)(e) finding.

### B. Best Interest Finding Under RCW 13.34.190(2)

The issue is whether substantial evidence supports the court's finding it was in A.W.'s best interest to terminate the parent's parental rights under RCW 13.34.190(2).

In addition to a finding the six statutory elements of RCW 13.34.180(1) by clear, cogent and convincing evidence, the second step requires the trial court to find by a preponderance of the evidence that termination is in the child's best interest. RCW 13.34.190(2). "Only if the first step is satisfied may the court reach the second." *A.B.*, 168 Wn.2d at 911. We afford a trial court broad discretion in making the "best interests" determination, and its decision receives great deference on review. *In re Welfare of Young*, 24 Wn. App. 392, 395, 600 P.2d 1312 (1979). Whether termination is in a child's best interests is based on the particular facts and circumstances of each case. *In re Dependency of A.V.D.*, 62 Wn. App. 562, 572, 815 P.2d 277 (1991). When a parent has failed to rehabilitate over a lengthy dependency period, a court is fully justified in finding termination to be in a child's best interests rather than leaving the child "'in the limbo of foster care for an indefinite period'" while the parent seeks further rehabilitation. *T.R.*, 108 Wn. App. at 167 (quoting *In re Dependency of A.W.*, 53 Wn. App. 22, 33, 765 P.2d 307 (1988)).

Here, the evidence overwhelmingly shows termination is in A.W.'s best interest. The GAL recommended termination of the parents' parental rights. The social worker

17

similarly concluded termination of parental rights was in the child's best interests. Treatment providers voiced concerns about E.A. and L.W.'s anger management and drug use, and E.A.'s mental health challenges. And lastly, little progress was shown by either parent during the two-year dependency period. The court's finding was supported by substantial evidence. We acknowledge E.A. and L.W. argue alternative placement options were available that might preclude a best interests finding. But, no relatives stepped forward as potential guardianship resources. There was no testimony regarding potential guardianship, no evidence of the availability of a guardianship placement. Thus, this argument lacks merit.

### C. Ineffective Assistance of Counsel

The issue is whether E.A. and L.W. were denied effective assistance of counsel. They contend their attorneys were deficient in failing to request a continuance. They argue, if a continuance had been granted, other placement options for A.W. could have been explored.

Washington law guarantees the right to counsel in termination proceedings. RCW 13.34.090(2); *In re Dependency of V.R.R.*, 134 Wn. App. 573, 581, 141 P.3d 85 (2006). This right includes the right to effective legal representation. *V.R.R.*, 134 Wn. App. at 580. No definitive Washington case has expressly held we apply the same test for ineffective assistance of counsel in civil parental termination cases that we apply in criminal cases. Division One of this court in *S.M.H.* applied the *Strickland*[3] standard to

---

[3] *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

determine ineffective assistance of counsel in a termination case and we adhere to that approach. *S.M.H.*, 128 Wn. App. at 61. To prevail on their ineffective assistance claim, E.A. and L.W. must show (1) deficient performance by counsel and (2) resulting prejudice. *S.M.H.*, 128 Wn. App. at 61; *Strickland*, 466 U.S. at 687. We strongly presume effective assistance. *State v. McNeal*, 145 Wn.2d 352, 362, 37 P.3d 280 (2002). Generally, performance is deficient when it falls below an objective standard of reasonableness, but not when undertaken for legitimate reasons of trial strategy or tactics. *State v. Horton*, 116 Wn. App. 909, 912, 68 P.3d 1145 (2003).

Here, both E.A. and L.W.'s attorneys requested a continuance in May 2013 because "[m]ultiple relatives have emerged and are willing to be a placement for the child." CP at 144, 148. The court denied the request due to the "length of time child has been out of the home, length of trial, lack of likelihood there will be a significant change in circumstances of the parents [sic] situation, and best interests of the child." CP at 140. The following month the court declared a mistrial due to a conflict of interest. Trial was rescheduled before another judge for September 16, 2013. Our record shows no alternative placement option was established during this three month delay, suggesting infeasibility. Given the apparent lack of options and the court's prior denial of the parents' request for a continuance, a legitimate reason existed for counsel's decision not to request another continuance. Without deficient performance, E.A. and L.W.'s ineffective assistance of counsel claim fails.

19

E.A. and L.W. unpersuasively argue the absence of information regarding possible placement defeats a finding under RCW 13.34.180(1)(f) "[t]hat continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home." RCW 3.34.180(1)(f) emphasizes a limited time frame for establishing permanency for a child by use of the phrase "early integration" into a stable and permanent home. The focus is "the parent-child relationship and whether it impedes the child's prospects for integration, not what constitutes a stable and permanent home." *In re Dependency of K.S.C.*, 137 Wn.2d 918, 927, 976 P.2d 113 (1999).

As noted, our record shows no alternative placement option was established. Instead, our record shows no petition for guardianship was filed and no evidence exists of the availability of a guardianship placement. Instead, the record shows A.W.'s potential for adoption into the foster families home where she has bonded, providing A.W. needed permanency. Accordingly, substantial evidence supports the court's finding that continuation of the parent-child relationship diminished A.W.'s prospects for integration into a stable and permanent home.

### D. Public Trial

The issue is whether E.A. was denied her right to a public trial. For the first time on appeal, she contends the courthouse was locked and not open to the public during a portion of the termination trial.

20

"Generally, a party asserting a constitutional error for the first time on appeal must show that the alleged error actually affected that party's rights at trial." *In re Dependency of J.A.F.*, 168 Wn. App. 653, 659, 278 P.3d 673 (2012) (citing RAP 2.5(a)(3)). In *J.A.F.*, Division One of this court declined to reach a similar challenge as E.A.'s because the parents did not object to the alleged closure at trial. *Id.* Because E.A. does not make a showing of how the alleged error affected her rights at trial, we decline to reach this issue.

Nevertheless we note no closure occurred. E.A.'s sole argument is based on a discussion between DSHS's counsel and the court. DSHS's counsel stated, "Your Honor that's my last witness that I had scheduled for the day and I might—I'm going to have to -- probably a bit of a challenge because I know the security closes at 4:00." RP at 112. The judge responded, "That's fine. As long as I have you out the door by 4:30." RP at 113. E.A. argues this colloquy shows the courtroom was closed to the public from 4:00 to 4:30. Her argument is a speculative assertion. The court was concerned the parties needed to exit the building by 4:30. Without showing a closure, E.A. cannot meet the threshold element of a public trial right violation argument. *See State v. Smith*, 181 Wn.2d 508, 513, 334 P.3d 1049 (2014) (courts must first look to whether "'there is in fact a closure of the courtroom'") (quoting *State v. Sublett*, 176 Wn.2d 58, 92, 292 P.3d 715 (2012) (Madsen, C.J., concurring)).

21

E. Due Process Challenge

The issue is whether L.W.'s constitutional due process rights were violated. L.W. contends he was denied due notice when the trial was rescheduled following the mistrial. We review de novo whether a proceeding violated constitutional due process. *In re Welfare of J.M.*, 130 Wn. App. 912, 920, 125 P.3d 245 (2005).

Courts balance three factors when examining process sufficiency: (1) the private interest at stake, (2) the risk that the procedure used will result in error, and (3) the State's interest in retaining the procedure used and the fiscal or administrative burden if additional safeguards were provided. *In re Dependency of A.G.*, 93 Wn. App. 268, 278-79, 968 P.2d 424 (1998). Due process protections in a termination hearing include a strict burden of proof, the right to notice, and an opportunity to be heard and defend. *In re Interest of Infant Child Skinner*, 97 Wn. App. 108, 114, 982 P.2d 670 (1999).

Our record does not reflect a notice violation. A summons was filed on July 19, 2012, advising L.W. of his legal rights, including his right to counsel. On July 20, 2012, L.W. was personally served with the notice and summons and termination petition as required by RCW 13.34.180(1). He was then appointed counsel. In June 2013, the court declared a mistrial due to a conflict of interest. The termination petition was not dismissed but was assigned to a new judge with trial rescheduled for September 16, 2013. L.W.'s counsel approved the trial date. L.W. claims he did not receive notice, but in addition to his counsel, L.W. received notice from a Texas social worker of the rescheduled trial date. L.W. presents no authority supporting his claim that DSHS was

22

No. 32084-7-III cons. w/ 32089-8-III
*In re Welfare of A.K.J.M.W.*

required to send him notice of a status conference order approved by his attorney. Due process is satisfied when a party is properly served with a notice and summons and petition. Given all, we conclude due process concerning notice was satisfied under the circumstances of this case.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Brown, A.C.J.

WE CONCUR:

_____
Korsmo, J.

_____
Lawrence-Berrey, J.

23