IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

|  |  |  |
|---|---|---|
| IN RE: D.R. | ) | No. 30298-9-III |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |
| | ) | |
| | ) | |

KORSMO, C.J. — Ms. B.R. completed "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future." Despite completing all necessary services, the trial court terminated B.R.'s parental rights because these services did not remedy all of her parental deficiencies. Because the outstanding deficiencies identified by the trial court were not connected to her ability to parent, we reverse.

FACTS

B.R. gave birth to a son, D.R., on December 10, 2006. Just before D.R.'s second birthday, Department of Social and Health Services (DSHS) removed him from B.R.'s

care[1] and initiated a dependency proceeding after a neighbor reported seeing the child's

uncle[2] dangle him by the leg over a second story balcony. The incident happened while

B.R. was in the kitchen cooking and asked the uncle to hold D.R. so he would stop

crying. When B.R. saw the uncle holding her son over the balcony, she ran over, grabbed

D.R., and severely scolded the uncle.

Despite the uncle's egregious conduct, and despite an agreement with DSHS to

remove the uncle, B.R. did not ask him to move out. The uncle did move out for a time,

but B.R. let him return not long after he moved out. B.R. explained that she did not force

the uncle out because she did not believe that he posed an ongoing risk to D.R. However,

B.R. testified at trial that she had come to recognize through the services provided by

DSHS that she could never trust the uncle again after that incident and that her inability

to trust the uncle meant that she should have made him leave her home regardless of the

lack of any ongoing risk of harm. The situation resolved itself during the dependency

when the uncle moved out and B.R. cut off all contact with him.

As part of the conditions of the dependency, the trial court ordered B.R. to

complete a psychological evaluation, a parenting class, a domestic violence victim

---

[1] The father did not live in the home with D.R., had little contact with his son prior to and during the dependency, and did not comply with services needed to maintain his parental rights.

[2] The uncle is the brother of Ms. B.R.'s eldest child's father, and not actually related by blood or marriage to Ms. B.R. or D.R.

assessment, a parenting assessment, and maintain regular visitation with D.R. During the parenting assessment, the assessor made the additional recommendation that B.R. complete 26 individual counseling sessions.

Over the course of the next year, B.R. completed 25 counseling sessions. At the end of that 25th session B.R. and her counselor made the mutual decision to end treatment because of B.R.'s significant progress. The counselor found that B.R. made progress on all issues presented for treatment and "[thought] it was quite successful." Report of Proceedings (RP) at 72.

B.R. was also successful in her other court-ordered services. Ann Crain, who took B.R. through the Project Safe Care parenting program, testified that B.R. and her son had a great connection with each other. Ms. Crain also testified that B.R. was the second-highest scoring person she had seen complete Project Safe Care. Susan Melton, B.R.'s visitation supervisor, also testified to the great bond that D.R. shared with his mother. She testified that he really looked forward to seeing his mother, was excited every time he saw her, and that there was "a very strong bond there." RP at 345.

Despite this success, the trial court found that B.R. still remained unfit because:

2.14.1 The mother is currently unfit to parent this child because she continues to minimize the dangerous behavior of the uncle that was the reason that brought the child into foster care.

2.14.2 Even though the mother has complied with all services ordered by the court, her attitude and behavior have not changed sufficiently for the child to be placed with her.

3

2.14.3 The mother continues to behave in a hostile and belligerent manner toward the Department and service providers.

2.14.4 Two psychologists diagnosed the mother as having a personality disorder, a diagnosis that is consistent with her behavior and that is not likely to change in response to services.

Clerk's Papers (CP) at 40 (Finding of Fact 2.14).

The noted psychologists were Dr. Roberto Valdez, who performed B.R.'s parenting assessment, and Dr. Paul Wert, who performed her psychological evaluation. They found that B.R. suffered from an Axis II severe personality disorder, not-otherwise-specified. The disorder manifested itself in particular with the way that B.R. interacted with DSHS staff. The personality disorder and B.R.'s bad attitude in turn caused these providers to conclude in their written reports that B.R. was not likely to succeed in all of her court-ordered services, which in turn made reunification within the near future unlikely. However, when informed at trial that B.R. had successfully completed the assigned services, both experts changed their opinions concerning her amenability to treatment.[3]

## ANALYSIS

Ms. B.R. presents four arguments for reversing the termination of her parental rights. She argues that the record contains insufficient evidence to support the findings

_____

[3] RP at 298-99, 319, 390-94, 401-03, 412.

4

required by RCW 13.34.180(1)(d), (e), (f), and RCW 13.34.190(1)(b). Because the absence of any of these elements is dispositive, we address the merits of only one of them: RCW 13.34.180(1)(e).

In order to terminate the parent-child relationship, one of the factors the State must prove by clear, cogent, and convincing evidence is that "there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." RCW 13.34.180(1)(e). The finding of fact "must be upheld if supported by substantial evidence from which a rational trier of fact could find the necessary facts by clear, cogent, and convincing evidence." *In re M.R.H.*, 145 Wn. App. 10, 24, 188 P.3d 510 (2008). Because the record does not contain clear, cogent, and convincing evidence linking the conditions identified in Finding of Fact 2.14 to Ms. B.R.'s ability to parent, we reverse. We address each of the conditions identified in this finding of fact in turn.

The first condition identified by the trial court was: "The mother is currently unfit to parent this child because she continues to minimize the dangerous behavior of the uncle that was the reason that brought the child into foster care." CP at 40.

We do not believe that a one-time mistake by a nonparent, who DSHS did not deem dangerous enough to investigate, can support the termination of a mother's constitutional right to raise her child. There are cases where parents' rights to their children can be terminated because of the parent's failure to recognize and mitigate the risk posed by a nonparent relative, but this is not one of those cases.

Instead, DSHS failed to introduce any evidence that the uncle presented an ongoing risk to D.R. that needed to be abated. In the cases where termination was supported by substantial evidence, the record contained evidence that the nonparent relative had a history of unresolved abusive tendencies. In *S.M.H.*, a mother lost her rights in part because she refused to cut off contact with her boyfriend—an admitted four-time child molester—and because the mother repeatedly stated her intentions to have the boyfriend move back into the home once a restraining order was lifted. *In re Dependency of S.M.H.*, 128 Wn. App. 45, 50, 57, 115 P.3d 990 (2005). In *L.N.B.-L.*, a mother lost her rights because she would not leave the father who had multiple domestic violence convictions, which also included assaults against the mother. *In re Welfare of L.N.B.-L.*, 157 Wn. App. 215, 229, 237 P.3d 944 (2010).

Here, the record establishes nothing about the uncle's dangerousness outside of this one-time incident. While this incident justified the filing of the emergency shelter care order and initiation of the dependency, it alone was not sufficient to justify termination of B.R.'s parental rights. To terminate those rights, DSHS had an affirmative duty to show that the uncle presented an ongoing risk of harm to the child; simple fear of the unknown cannot support that burden. Accepting as true the finding that B.R. failed to recognize or acknowledge the danger posed by the uncle, we cannot hold that against her because the record does not contain any evidence that there was a current danger that she needed to acknowledge.

This case is also unlike *S.M.H.* and *L.N.B.-L.* because the condition in this case had abated prior to the termination proceedings. RCW 13.34.180(1)(e) requires that the condition cannot be remedied so that the child can be returned in the near future. In *S.M.H.* and *L.N.B.-L.* the condition could not be remedied because the mothers in those cases refused to cut off contact with the dangerous person in their lives. Here, the uncle moved out and B.R. cut off all contact with him with no intention of having any contact with him again. Accordingly, any dangerous condition created by the uncle had been remedied.

The second and third conditions identified by the trial court are tied together. The second condition stated: "Even though the mother has complied with all services ordered by the court, her attitude and behavior have not changed sufficiently for the child to be placed with her." CP at 40. The third condition stated: "The mother continues to behave in a hostile and belligerent manner toward the Department and service providers." *Id.*

Recognizing that B.R.'s attitude and distrust of DSHS are not proper bases for termination, DSHS argues that the trial court did not actually take those into account in making its decision. Resp't Br. at 29. While the trial court's oral ruling stated that B.R.'s attitude and hostility were not bases for its decision, the written findings state otherwise. Because no one tied these findings to B.R.'s ability to parent or to succeed in services, they fail to support termination. *In re Dependency of T.L.G.*, 126 Wn. App. 181, 204-05, 108 P.3d 156 (2005) (reversing termination because DSHS failed to connect parents'

7

mental health problems and need for 3 to 5 years of intensive psychotherapy to their ability to parent). While B.R. had a duty to comply with all ordered services, no statute or rule required her do so with a smile on her face.

The final condition identified by the trial court was: "Two psychologists diagnosed the mother as having a personality disorder, a diagnosis that is consistent with her behavior and that is not likely to change in response to services." CP at 40. Accepting this finding as true, it too fails to support the trial court's order terminating parental rights.

"[M]ental illness is not, in and of itself, proof that a parent is unfit or incapable." *T.L.G.*, 126 Wn. App. at 203. "The court must examine the relationship between the mental condition and parenting ability." *Id.* Here, the mental health professionals testified that B.R.'s personality disorder made it unlikely that she would succeed in services. They did not find that this personality disorder in and of itself put D.R. at risk or made B.R. inattentive to D.R.'s needs. While we do not doubt that B.R.'s personality disorder made her a difficult client, the uncontroverted testimony of her treatment providers shows that she was able to overcome this illness and succeed in all of her classes and counseling. Because the conditions identified in support of the finding required under RCW 13.34.180(1)(e) were not tied to B.R.'s ability to parent or any risk of harm to the child, the evidence did not support the judgment.

8

B.R. is undoubtedly a difficult person to counsel and her difficulties may yet prevent her from reuniting with D.R. Nonetheless, there needs to be evidence connecting her deficiencies to her ability to parent her child.

Reversed and remanded for further proceedings.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Korsmo, C.J.

WE CONCUR:

_____        _____
Kulik, J.                                Fearing, J.

9