# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In re the Dependency of: | ) | No. 74875-1-I |
| | ) | (consolidated with No. 74876-9-I) |
| C.J.F. (DOB: 03/22/2003), | ) | |
| | ) | DIVISION ONE |
| Minor child. | ) | |
| | ) | |
| INES FAIR and JAKE FAIR, | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF WASHINGTON, | ) | UNPUBLISHED |
| DEPARTMENT OF SOCIAL AND | ) | |
| HEALTH SERVICES, | ) | FILED: January 23, 2017 |
| | ) | |
| Respondent. | ) | |

Cox, J. – Jake and Ines Fair appeal the trial court's order terminating their parental rights to their son, C.J.F. Both parents contend that the State failed to prove (1) that all necessary and available services capable of correcting their parental deficiencies were provided, (2) that there was little likelihood their parental deficiencies could be remedied so that C.J.F. could be returned in the near future, and (3) that termination of parental rights was in C.J.F.'s best interests. The parents also challenge the trial court's finding that the State made active efforts to provide remedial services as required by the federal and state Indian Child Welfare Act (ICWA). Because substantial evidence supports the trial court's findings and the findings support the conclusions of law, we affirm the termination order.

The Fairs are the parents of four children: daughter S.F. (born March 31, 2001), son C.J.F. (born March 22, 2003), son R.P.F. (born July 26, 2006) and son B.C.F. (born September 27, 2008).

C.J.F. was diagnosed with autism spectrum disorder in 2006. He has also been diagnosed with attention deficit hyperactivity disorder (ADHD), obsessive compulsive disorder (OCD) and posttraumatic stress disorder (PTSD). C.J.F. presents with serious behavioral challenges, including aggression, self-injury, and running away. He requires constant adult supervision.

On June 17, 2012, the Fairs were putting their children to bed when C.J.F. refused to put on his pajamas. Jake[1] hit C.J.F. with a belt on his bare skin approximately 60 to 75 times. C.J.F. arrived at school the following day with extensive bruising on his legs and buttocks. C.J.F.'s teacher described the bruising as so severe she was surprised C.J.F. could even sit down.

Further investigation revealed several other instances of physical and verbal abuse, particularly against C.J.F.[2] C.J.F.'s school bus driver had observed bloody scratches on C.J.F.'s neck that Ines admitted inflicting. The bus driver had also observed Ines grabbing C.J.F. by the throat and yelling at him. On another occasion, when C.J.F. resisted getting off the bus, Ines grabbed C.J.F. by the leg and dragged him down the steps onto the sidewalk. C.J.F.'s

---

[1] Because the parents share the same last name, we refer to them by their first names for clarity.

[2] According to the testimony at trial, when 2-year-old S.F. complained she was hot and repeatedly tried to take off a sweater, Ines pinned her down and spanked her severely. The Fairs also admitted they spanked R.P.F. and B.C.F. with a belt.

2

teacher observed Ines tell C.J.F. that he would have a cold shower and no dinner because he had misbehaved in class.

The Department filed a dependency petition and all four children were placed with their paternal aunt and her partner. Jake reported to the Department that he had Cherokee heritage. The Department promptly contacted the three federally-recognized Cherokee tribes, all of which responded that the children did not qualify as Indian children under the Indian Child Welfare Act (ICWA).

On January 7, 2013, Jake pled guilty to one count of assault of a child in the second degree. He was subsequently sentenced to a term of 31 months. The terms of Jake's community custody prevented him from living with any of the children until April 2016. A separate no-contact order prevented Jake from having any contact with C.J.F. until 2023 except for professionally supervised visits.

On January 23, 2013, both parents agreed to the establishment of dependency. The court order required Ines to participate in a parenting class, parent coaching, mental health counseling, a psychological evaluation, an anger management evaluation and a domestic violence assessment. The court also ordered Ines to participate in classes and support groups at The ARC of Snohomish County (ARC), a nonprofit outreach center for people with disabilities, including autism. The court ordered Jake to participate in a psychological evaluation, mental health counseling, parenting classes and a parenting coach. The Department also referred Jake to ARC upon his release from prison.

3

The parents complied with all of these services, though Ines made only limited use of ARC's resources and Jake did not contact them at all. Though providers testified that the Fairs generally made progress in their services, they continued to have difficulty handling C.J.F. during visits. For example, the Fairs continued to demonstrate unrealistic expectations for C.J.F.'s behavior. They also continued to physically restrain C.J.F. at visits for minor transgressions, despite the advice of multiple professionals, which caused C.J.F. to react aggressively. At the time of trial, the parents' visits with C.J.F. were still limited to once a week. And C.J.F. was rarely incorporated into the Fairs' visits with their other children because it was too overstimulating for C.J.F. On August 15, 2014, the Department filed a termination petition.[3]

In June 2015, Jake was enrolled as a member of the Cherokee Nation. The Cherokee Nation subsequently notified the Department that the tribe considered the children to be Indian children as defined by the ICWA.

Trial on the termination petition began on November 16, 2015. At the time of trial, C.J.F. was 12 years old and had been out of his parents' custody for more than three years. Following the testimony of 23 witnesses and the admission of 88 exhibits, the trial court entered findings of fact and conclusions of

---

[3] The Department did not include S.F. in the termination petition because she had been returned to her mother's care by that time. The trial court did not terminate the parents' rights to R.P.F. and B.C.F., finding that termination was not in R.P.F.'s best interests and that the State had not shown that B.C.F. could not be returned to his mother's care in the near future. Only C.J.F. is the subject of this appeal.

law and an order terminating the Fairs' parental rights to C.J.F. Both parents appeal.

## SERVICES

The Fairs contend that the Department failed to provide them with all necessary services capable of correcting their parental deficiencies. Specifically, the Fairs argue that they were not provided with hands-on parenting training for children with autism. We disagree.

Parental rights are a fundamental liberty interest protected by the United States Constitution.[4] To terminate the parent-child relationship, the Department must prove each of six statutory elements of RCW 13.34.180(1) by clear, cogent, and convincing evidence.[5] If the trial court finds that the State has met its burden under RCW 13.34.180, it may terminate parental rights if it also finds by a preponderance of the evidence that termination is in the "best interests" of the child.[6]

One of these elements the Department must prove is that "the services ordered [by the court] have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and

---

[4] Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).

[5] In re Dependency of K.N.J., 171 Wn.2d 568, 576-77, 257 P.3d 522 (2011).

[6] RCW 13.34.190(1)(b).

understandably offered or provided."[7] A service is "necessary" if it is "needed to address a condition that precludes reunification of the parent and child."[8] A service is "reasonably available" if it is "available within the department or supervising agency, or within the community" or "the department has existing contracts to purchase" it.[9] However, if a parent is unwilling or unable to make use of the services offered or provided, the Department is not required to offer additional services that might have been helpful.[10]

Findings of fact must be supported by substantial evidence.[11] Unchallenged findings of fact are verities on appeal.[12] In determining whether substantial evidence supports the trial court's findings, we will not weigh the evidence or the credibility of witnesses.[13]

Here, substantial evidence supports the trial court's finding that all necessary and reasonably available services were offered to the parents. Prior to the dependency petition, C.J.F.'s teachers worked to help the Fairs understand C.J.F.'s condition. They also explained to the Fairs that physical discipline was not effective on children with autism. They referred the Fairs to

---

[7] RCW 13.34.180(1)(d).

[8] In re Dependency of A.M.M., 182 Wn. App. 776, 793, 332 P.3d 500 (2014).

[9] RCW 13.34.136(1)(b)(vii).

[10] In re Dependency of S.M.H., 128 Wn. App. 45, 54, 115 P.3d 990 (2005).

[11] Dep. of K.N.J., 171 Wn.2d at 577.

[12] In re Interest of J.F., 109 Wn. App. 718, 722, 37 P.3d 1227 (2001).

[13] In re Dependency of E.L.F., 117 Wn. App. 241, 245, 70 P.3d 163 (2003).

ARC. ARC offers a wide variety of resources for parents of children with autism, including trainings, lectures and workshops, support groups for parents and siblings, and socialization activities for children. Workshop topics have included medications, legal issues, individual education plans (IEPs) and dietary changes.

The Fairs attended some meetings and support groups at ARC prior to the dependency proceedings. However, their participation declined dramatically after dependency was established. Jake did not attend any ARC events after his release from prison in October 2014 and Ines attended only one workshop. Ines testified that she was unwilling to make use of ARC's resources unless C.J.F. was in her care. She testified that "to apply the principles and ideas that they had there, which are good ones, in a visit doesn't really work" because "the situation which visitations are is an artificial one."[14] Ines also stated that she felt uncomfortable at ARC because she believed the other parents did not like her.

In addition, the Department referred both parents to Marie Preftes-Arenz, a parent coach and in-home therapist who has both personal and professional experience involving children with autism. Preftes-Arenz began working with both parents in November 2012. When Jake went to prison in January 2013, Preftes-Arenz continued to work with Ines until March 2013. Preftes-Arenz worked with the family again from late 2014 until January 2015, and from April 2015 up until the termination trial.

---

[14] Report of Proceedings (Nov. 30, 2015) at 795.

Preftes-Arenz explained that parent coaching is "hands-on and interactive" and "different from formal education."[15] Preftes-Arenz was present for the Fairs' visits with C.J.F. She taught the parents skills that were effective for autistic children, including positive reinforcement, appropriate discipline strategies, and stress management techniques. After teaching a specific skill, Preftes-Arenz would model the skill for the parents to observe. Preftes-Arenz would then give the parents the opportunity to practice the skill, and provide feedback. However, Preftes-Arenz testified that all autistic children were different and that there was no "one-size-fits-all" strategy for parenting children with autism. She explained that "trying to understand how autism affects [C.J.F.] specifically is one of the ways that I can help the parents parent him better."[16] Preftes-Arenz also encouraged the parents to develop a "tool kit" of strategies so that if C.J.F. was not responding to one technique, they had other available options.

In addition, Preftes-Arenz talked to C.J.F.'s caregivers about what was working in their home, and communicated that to the parents. Preftes-Arenz also encouraged Ines "to attend any workshop or class she can and to keep reading and researching about Autism." However, Preftes-Arenz noted that Ines did not follow through with this goal.

Moreover, the Department referred C.J.F. to Christina Alexander, a therapist at Ryther Child Center, for trauma-focused cognitive behavioral therapy (TF-CBT). Alexander taught C.J.F. coping skills such as muscle relaxation, deep

---

[15] Id. (Nov. 19, 2015) at 637-38.

[16] Id. at 574.

breathing and visualization. By the time of trial, Alexander had been working with C.J.F. for over two years. Alexander met with Ines twice in 2014 and went over some of these techniques. However, Ines did not contact Alexander again after these two meetings.

The Department also attempted to provide C.J.F. with Applied Behavior Analysis (ABA) therapy, a behavioral therapy specifically targeted for children on the autism spectrum. Unfortunately, there were no ABA providers in Snohomish County that would accept C.J.F. as a client. The Fairs do not challenge the trial court's finding that the Department "made a significant effort to find this service, but was not able to do so" and "ABA therapy for [C.J.F.] was not reasonably available."[17]

C.J.F.'s aunt and her partner had great success managing C.J.F.'s behaviors. The aunt testified that she was willing to work with the Fairs to show them which behavior management techniques worked well with C.J.F. Ines refused to speak to the aunt, even referring to her as "it" in front of the children. Both the Department and the aunt offered to participate in mediation or dispute resolution to improve the relationship. Ines refused.

Finally, Yasmin Amiri, the volunteer guardian ad litem (VGAL), attempted to provide the parents with additional education and training opportunities. Amiri was in a unique position to offer assistance, having previously been a provider of

_____

[17] Clerk's Papers at 38 (Findings of Fact 2.80 and 2.81). Though Ines assigns error to these findings, she does not support her assignments of error with legal argument or analysis. Thus, we consider them as verities. See Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

ABA therapy to children. Amiri offered Ines books and articles on autism, and suggested other trainings such as those put on by the VGAL program. Again, Ines refused. Amiri testified that Ines "had developed a certain response mechanism to most people involved in the case" and would shut down even when people were trying to help her.[18]

Contrary to the parents' claim, there is no evidence that there were other available services that the Department failed to offer. Dr. Jason Prinster, a psychologist who evaluated the Fairs, recommended both parents participate in services for parenting autistic children. However, Dr. Prinster testified that those services "could be a program, classes, [and] other sources of parenting education or coaching."[19] Judith Bronson, Jake's domestic violence treatment counselor, testified that the parents should be involved in a program "regarding specific parental treatment of autistic children."[20] But Bronson clarified that she was referring to ABA therapy, which is a service for the child, not their parents or caregivers.

In re Welfare of C.S.,[21] which Ines relies upon, is distinguishable. In C.S., the trial court terminated a mother's parental rights based on an alleged inability to address her child's special needs. The Department had offered specialized training to the caregivers but not the mother. But C.S. "does not stand for the

---

[18] Report of Proceedings (Dec. 1, 2015) at 1119.

[19] Id. (Nov. 17, 2015) at 393.

[20] Id. (Nov. 30, 2015) at 935.

[21] 168 Wn.2d 51, 225 P.3d 953 (2010).

10

proposition that noncustodial parents must receive services identical to the foster parents."[22] In any event, unlike C.S., there was no evidence here that the caregivers received training or services that the Fairs did not.

Finally, Jake contends that the Department should have offered other helpful services, such as alternative for family cognitive behavioral therapy (AF-CBT), "therapeutic visits" or family therapy. But there is no evidence in the record that any of these services were recommended or reasonably available. Alexander testified that she did not provide AF-CBT and did not know any providers who did. And Kelli Hogan, a Department social worker, testified that the Department typically did not have contracts for therapeutic visitation.

## ACTIVE EFFORTS

The Fairs argue the State failed to make active efforts to prevent the breakup of the Indian family as required by RCW 13.38.130(1). The record does not support this claim.

In the context of Indian children, federal and state statutes place additional burdens on the State prior to termination.[23] The State must also prove that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[24] "Active efforts" are defined as "a showing to the court that the department or supervising agency social workers actively

---

[22] Matter of K.M.M., 186 Wn.2d 466, 488, 379 P.3d 75 (2016).

[23] 25 U.S.C. § 1912; RCW 13.38.130(1), (3).

[24] 25 U.S.C. § 1912(d); RCW 13.38.130(1).

11

worked with the parent, parents, or Indian custodian to engage them in remedial services and rehabilitation programs ordered by the court or identified in the department or supervising agency's individual service and safety plan beyond simply providing referrals to such services."[25]

The parents contend that referring them to ARC and expecting them to learn about C.J.F.'s needs on their own does not constitute active efforts. But, as discussed above, the Department did more than simply provide referrals. The Department engaged service providers to teach the parents skills for parenting an autistic child. When the parents had success working with Preftes-Arenz, the Department extended her contract twice. The Department also updated Ines's psychological evaluation twice in order to determine if additional services were necessary. In addition, the Department facilitated meetings between Ines and C.J.F.'s treatment providers. The Department also offered to improve the relationship between the parents and the caregivers so that the caregivers could help the parents understand C.J.F. better.

Jerrid Miller, a tribal social worker with the Cherokee Nation, testified on behalf of the tribe. Miller reviewed 25 volumes of discovery and participated throughout the entire termination trial as the tribe's representative. Miller agreed the Department had made active efforts to provide appropriate services and those efforts had been unsuccessful. He also testified that he had discussed the case with several other Cherokee Nation social workers and that the tribe supported termination of parental rights. Miller's testimony, in addition to the

---

[25] RCW 13.38.040(1)(a)(iii).

other evidence in the record, was sufficient to support the trial court's finding that active efforts were made.

## LIKELIHOOD OF REUNIFICATION

The Fairs argue that the Department failed to prove there was little likelihood that that C.J.F. could be returned in the near future, as required by RCW 13.34.180(1)(e). Again, the trial court's findings to the contrary are supported by substantial evidence.

The focus of RCW 13.34.180(1)(e) is whether a parent's identified deficiencies have been corrected.[26] "Even where there is evidence that the parent may eventually be capable of correcting parental deficiencies, termination is still appropriate where deficiencies will not be corrected within the foreseeable future."[27] Although the law provides no numerical standard to measure the foreseeable future, this determination is a factual inquiry evaluated from "the child's point of view," which varies with the child's age.[28]

At the time of trial, the parents were visiting with C.J.F. only once a week for an hour. The visits with C.J.F. were separate from the Fairs' visits with their other children, and were typically supervised by both a professional visitation supervisor as well as Preftes-Arenz. Department social worker Katrina Maloney testified that moving towards unsupervised visits with C.J.F. could take

---

[26] In re Welfare of M.R.H., 145 Wn. App. 10, 27, 188 P.3d 510 (2008).

[27] In re Welfare of A.G., 155 Wn. App. 578, 590, 229 P.3d 935 (2010).

[28] In re Dependency of A.C., 123 Wn. App. 244, 249, 98 P.3d 89 (2004).

13

"months."[29] Preftes-Arenz testified that reunification of C.J.F. would take "quite a period of time" due to his need for structure and consistency.[30] According to Preftes-Arenz, any reunification plan was "going to be more on [C.J.F.'s] timeline."[31] In addition, Preftes-Arenz testified that C.J.F. should not be reunified until after R.P.F. and B.C.F. had been successfully transitioned back to Ines's home, something that had not yet begun.

Moreover, Jake was not permitted to live in the family home or to have any contact with C.J.F. unless supervised by a professional until 2023. Jake argues that this should not be a basis for termination of his parental rights. He argues that he should be permitted to share parenting responsibility for C.J.F. even if he does not live in the home, as is the case with many noncustodial parents. But this proposal is unworkable if C.J.F. cannot be returned to Ines's care. The trial court did not err in finding that there was little likelihood that C.J.F. could have been returned to the parents in the near future.

## BEST INTERESTS

Finally, the Fairs challenge the trial court's finding that termination was in C.J.F.'s best interest.

As an initial matter, Ines argues that the trial court prematurely reached this issue because the State had not established the statutory elements set forth in RCW 13.34.180(1)(d) and (e). But as discussed above, there was substantial

---

[29] Report of Proceedings (Dec. 1, 2015) at 1216.

[30] Id. (Nov. 19, 2015) at 605.

[31] Id. at 650.

evidence in the record to support the court's findings that these elements were proved by clear, cogent, and convincing evidence. Thus, the court properly reached the second prong of analysis: whether it was in C.J.F.'s best interest to terminate parental rights.

The parents also contend that termination was not in C.J.F.'s best interests because he was bonded to them and to his siblings. A child has a right to "a safe, stable, and permanent home and a speedy resolution" of dependency proceedings.[32]

Where a parent has been unable to rehabilitate over a lengthy dependency period, a court is "fully justified" in finding termination in the child's best interests rather than "leaving [the child] in the limbo of foster care for an indefinite period" while the parent rehabilitates himself or herself.[33]

The best interests of a child must be decided on the facts and circumstances of each case.[34] A trial court is afforded broad discretion in making a "best interests" determination, and we give its decision great deference on review.[35]

The trial court did not ignore the parent-child bond in making its decision. The parents do not challenge the trial court's finding that "[h]is parents clearly

---

[32] RCW 13.34.020.

[33] In re Dependency of T.R., 108 Wn. App. 149, 167, 29 P.3d 1275 (2001).

[34] In re Dependency of A.V.D., 62 Wn. App. 562, 572, 815 P.2d 277 (1991).

[35] In re Welfare of Young, 24 Wn. App. 392, 395, 600 P.2d 1312 (1979).

15

love [C.J.F.], however they cannot effectively parent him."[36] But at the time of trial, C.J.F. had been dependent and out of his parents' care for more than three years. During that time, the parents made progress but did not gain enough skills to be able to parent C.J.F. safely or effectively.

We affirm the trial court's order terminating the Fairs' parental rights.

_Cox, J._

WE CONCUR:

_Trickey, A.C.J._        _Appelwick, J._

---

[36] Clerk's Papers at 35 (Findings of Fact 2.31).